UNITED STATES of America, Appellee,

v.

Felix RESTO, Appellant.

No. 1272, Docket 87–1124.

United States Court of Appeals,
Second Circuit.

Argued June 16, 1987.

Decided July 21, 1987.

Mark C. Hansen, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., and Kenneth Roth, Asst. U.S. Atty., of counsel), for appellee.

Minna Schrag, New York City (Andrew W. Reich, Proskauer, Rose Getz & Mendel-

sohn, New York City, of counsel), for appellant.

Before OAKES, MESKILL and PRATT, Circuit Judges.

OAKES, Circuit Judge:

Felix Resto appeals from his conviction following a jury trial in the United States District Court for the Southern District of New York, Vincent L. Broderick, Judge, for aiding in a sale of "crack" within 1,000 feet of a school in violation of 21 U.S.C. §§ 812, 841(a)(1), 845(a). Resto was sentenced to two years' imprisonment, a consecutive six-year special parole term, and a $50 assessment. His contentions on this appeal are, first, that there was insufficient evidence to convict him; second, that the prosecutor made improper remarks during summation; and, third, that the method of jury selection used by the court deprived him of a fair trial. We affirm.

The Government's case against Resto consisted entirely of the testimony of New York City police officer Hector Vega. At trial, Officer Vega testified that on August 7, 1985, he was assigned to make undercover narcotics purchases in the Washington Heights area of Manhattan. This area, on the New York side of the George Washington Bridge, is known as a place where crack and other drugs are openly sold, frequently to buyers who are going to or have come from New Jersey. While patroling with a partner through Washington Heights in an unmarked car bearing New Jersey license plates, Vega spotted Resto standing alone on the sidewalk in front of 575 West 177th Street. Vega made "eye-to-eye" contact and exchanged gestures with Resto, who said "get the car out of there." After Vega's partner moved the car, Vega got out and walked back to where Resto was standing. Vega testified that Resto "warned me about parking the car in front of the place and told me not to do it again." Vega then asked Resto if he "had anything," and Resto said "how many are you looking for?" Vega said "five," and Resto pointed to a nearby alleyway. At the end of the long, narrow alley in a spot not visible from the street, Vega met Jorge Torres, Resto's codefendant, and purchased three vials of crack for $30. Both Torres and Resto were later arrested by other officers. At the time of his arrest, Resto had no drugs or any of the recorded "buy money" on his person.

Vega, who has made 150 undercover purchases, also testified as an expert on the role of "steerers" in street crack sales. According to Vega, a steerer usually aids in the drug sale by standing a short distance away from the carrier of the drugs, soliciting or screening potential buyers, and guiding buyers to the carrier, who then completes the sale. A steerer may be part owner of the drugs being sold, or may simply receive a share of the proceeds after the sale. While Vega's testimony strongly suggests Resto was a steerer, he did not directly identify Resto as a steerer.

Resto did testify on his own behalf. He painted a rather different picture of his role in the transaction. He stated that he lived about one block west of the site of the arrest and that he knew that drugs were commonly sold in the area. According to his testimony, on August 7 he was returning to his apartment after an unsuccessful attempt to collect his pay for some work he had done the day before. He stopped on the sidewalk to speak to a friend and realized from the number of people going into the alleyway at 575 West 177th Street that drugs were being sold somewhere down the alley. When Resto and his companion were approached by Vega, Resto "nodded his head" toward the alley, thinking it quite obvious that that was where drugs could be purchased. Resto testified that he then returned to his apartment, got his wallet, and left to visit his girlfriend. On his way he bought a soda, and he was then arrested as he walked east on West 177th Street, across the street from the alleyway where Vega had purchased the drugs from Torres.

In light of the above testimony, we agree with Judge Broderick's observation that the evidence against Resto was "thin," particularly because no narcotics or buy money were found on Resto and there was no express showing of contact or coopera-

tion between Resto and Torres. Nonetheless, under *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), we must uphold a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *See also United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir.1986). Here, Vega's testimony presented the jury with three acts that tied Resto to the drug sale: Resto scolded Vega for stopping the car near where the sale was to take place and told him "not to do it again"; he asked Vega "how many are you looking for"; and he directed Vega to the alleyway where Torres was selling "crack." On these facts, the jury, believing Vega's testimony, could reasonably have found that Resto was a "steerer" for the crack sale by Torres.

*United States v. Ford*, 771 F.2d 60 (2d Cir.1985), and *United States v. Brown*, 776 F.2d 397 (2d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986), relied on by Resto, are inapposite, as in both of those cases we upheld a jury verdict against a sufficiency challenge, to be sure over the dissent of the author of this opinion. In *Ford* the defendant said, "How many do you want," but did nothing more, and was merely present along with two others during the cocaine sale. 771 F.2d at 61. In *Brown*, which involved a conspiracy conviction (the jury was unable to reach a verdict on an aiding and abetting charge), defendant simply said about the purchaser, "He looks all right to me," and to the seller, "Just go and get it for him." 776 F.2d at 399. Thus, in light of Vega's testimony and our previous affirmance of convictions based on similarly "thin" facts, we conclude that Resto has not met his "heavy burden" of showing that the jury's verdict is based on insufficient evidence. *See United States v. Grubczak*, 793 F.2d 458, 462–63 (2d Cir.1986).

■ Resto also argues that the prosecutor made several remarks during summation that were improper and merit reversal.

Viewing the prosecutor's comments in the context of the trial and the summations in their entirety, as we must, *see United States v. Bagaric*, 706 F.2d 42, 58–61 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983), we find that the remarks were permissible responses to contentions made by defense counsel in her summation. In particular, in rebuttal summation, the prosecutor responded to the claim that Resto's testimony was merely "confused" by saying, "[T]hose are nice words to try and cover up what are really flat out-and-out lies." In the context of responding to the defense claim that Vega was exaggerating the facts, the prosecutor stated, "[I]f you believe that Officer Vega would completely make up a story to frame an innocent person, then ... it is your duty to ... acquit Mr. Resto," and, "Compare the interest of Mr. Resto in telling you a lie, compared with the interest of Officer Vega." In *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir.1987), this court stated that "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory." Here, the prosecutor's remarks were neither excessive nor inflammatory.

■ Similarly, we find no ground for reversal in the prosecutor's references to specific defense tactics as "slick bits" and "slyness" or in his statements that the defense engaged in "sleight-of-hand" and tried to pull the wool over the jury's eyes. These comments on the defense counsel's conduct were improper and Judge Broderick properly reprimanded the prosecutor for making them. The prosecutor's remarks were not, however, so egregious as to warrant reversal. *Cf. United States v. Biasucci*, 786 F.2d 504, 514 (2d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986) (finding that prosecutor's insulting remarks about defense counsel were improper, but did not require reversal).

This brings us, then, to Resto's challenge to the method of jury selection used by the district court. In a somewhat unusual pro-

cedure, a jury was selected for this case and *United States v. Vargas*, another narcotics case, at the same time. The procedure involved joint voir dire of the entire panel—a venire of fifty people—followed by selection in *Vargas* and then selection in this case. After the jury was selected in *Vargas*, a panel of twenty-nine prospective jurors remained—seventeen of whom had been peremptorily challenged either by the *Vargas* defense counsel (eleven) or prosecutor (six). The jury was then selected using the "struck" jury system,[1] with Resto using ten strikes and the Government six, resulting in a jury of thirteen (with one alternate), five of whom had previously been struck in *Vargas*. Resto argues that this method of selection improperly diluted his right to exercise peremptory challenges and deprived him of a randomly selected venire.

■ Regarding the peremptory challenge claim, in *United States v. Blouin,* 666 F.2d 796, 797 (2d Cir.1981), we stated that "trial courts retain a broad discretion to determine the way peremptory challenges will be exercised." However, " '[a]ny system for the empanelling of a jury that pre[v]ents or embarrasses the full, unrestricted exercise by the accused of [his right to challenge peremptorily] must be condemned.' " *Id.* (quoting *Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894)).[2] Even so, *Blouin* made clear that a defendant "cannot succeed in his claim simply by showing that he could, under some procedure, have made more effective use of his peremptories." 666 F.2d at 798.

Applying these principles to the facts of this case, we note, as the Government argues, that there is not much difference between the system used here and the most commonly used system, which allows jurors who have been peremptorily challenged in one case to go back into the juror pool where they may again be selected for voir dire and eventual service on other jury panels. Under either procedure the defense counsel will be required to select jurors from a group that may include individuals who have previously been challenged. The only differences between the procedure used in this case and the usual procedure is that by jointly selecting from one panel, the second defendant is guaranteed to be faced with a certain number of challenged jurors, rather than merely facing the risk of having some challenged jurors on the panel, and the defense counsel will, as here, be aware of precisely which veniremen had been challenged by the previous defense counsel. In our minds, these differences do not amount to a restriction on the defense counsel's ability peremptorily to challenge potential jurors. Admittedly, if Resto's counsel had wished to exclude all the previously challenged veniremen from Resto's jury, she would have had to use all her peremptory challenges, thus making her unable to challenge (except for cause) any of the members of the panel who had not been subjected to voir dire in *Vargas*. But while this problem may make more difficult a defense counsel's choice of which prospective jurors to challenge—the knowledge that a particular venireman had been peremptorily challenged by a similarly situated defendant

1. *United States v. Blouin,* 666 F.2d 796 (2d Cir. 1981), describes the "jury box" system as opposed to the "struck jury" system, noting that in the former the parties tend to focus on one member of the venire at a time, while in the latter they tend to ask, " 'Which twelve of these twenty-eight will be most favorable to my side?' " *Id.* at 798. While *United States v. Ricks,* 802 F.2d 731, 733–34 (4th Cir.) (en banc), *cert. denied sub nom. King v. United States,* —— U.S. ——, 107 S.Ct. 650, 93 L.Ed.2d 703 (1986) (number of veniremen provided for "struck jury" should not exceed number of jurors plus number of peremptory challenges), is cited several times to us, no argument is or could be made by appellant that the number of jurors in the ve-

nire (29) was so large as to dilute his rights to exclude potential jurors of whom he disapproved; Resto had ten challenges, the Government six, and there was to be one alternate.

2. *Blouin* upheld the use of a "jury box" system that required the exercise of the defendant's last challenge before two replacement jurors for the twelve-person jury were picked. Judge Newman distinguished the system struck down in *Carr v. Watts,* 597 F.2d 830 (2d Cir.1979), which required the exercise of the last challenge before three replacement jurors for a six-person jury were picked.

may well be a factor worth considering in exercising one's own challenges—it does not restrict the counsel's ability to exercise those challenges or to allocate the challenges among the prospective jurors as he or she sees fit. In the absence of a right to choose a jury from a panel of veniremen who have not previously been challenged by another defendant, a right which Resto does not claim, we do not feel that the jury selection procedure used here is unacceptable under the standards we announced in *Blouin, supra.*

█ Finally, Resto argues that his venire was not composed of members of the public drawn at random, in violation of 28 U.S.C. § 1866, because the selection of the *Vargas* jury from the fifty-member venire "destroyed randomness." In *United States v. Jasper,* 523 F.2d 395, 398 (10th Cir.1975), *cert. denied,* 423 U.S. 1075, 96 S.Ct. 859, 47 L.Ed.2d 85 (1976), however, the court held that the inclusion in a venire of ten jurors who had been challenged in a similar case did not violate section 1866. And, section 1866(c) itself states that "[a]ny person excluded from a particular jury ... shall be eligible to sit on another jury if the basis for his initial exclusion would not be relevant to his ability to serve on such other jury." Here, there is no dispute that the original venire of fifty was fairly drawn, and we see no reason to conclude that the fact that an individual had been peremptorily challenged by a similarly situated defendant is relevant to the individual's ability to serve as a juror in a second case. The cases cited by Resto, *United States v. Branscome,* 682 F.2d 484, 485 (4th Cir. 1982), and *United States v. Kennedy,* 548 F.2d 608, 610–12 (5th Cir.), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977), are inapposite as they both involved jurors who volunteered for service—thus destroying randomness.

Judgment affirmed.