**UNITED STATES of America,**
**Plaintiff/Appellee,**

v.

**Gustavo ALVARADO,**
**Defendant/Appellant.**

**UNITED STATES of America,**
**Plaintiff/Appellee,**

v.

**Oscar OQUELI–HERNANDEZ,**
**Defendant/Appellant.**

**Nos. 85–5278, 85–5280.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 1, 1986.

Decided May 18, 1987.

Amended Jan. 28, 1988.

3. We reject the state's argument that Moeller has not exhausted his state remedies.

Marilyn E. Butler, Federal Public Defender, Joseph F. Walsh, Los Angeles, Cal., for defendants-appellants.

Manuel A. Medrano, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before J. BLAINE ANDERSON, CANBY and WIGGINS,[*] Circuit Judges.

## AMENDED OPINION

J. BLAINE ANDERSON, Circuit Judge:

Gustavo Alvarado (Alvarado) and Oscar Oqueli–Hernandez (Oqueli) were indicted for conspiring to import (Count I), for importing (Count II), and for possessing with the intent to distribute (Count III), 12.7 kilograms of cocaine. A jury found both guilty on all counts. Alvarado and Oqueli sought a new trial charging that: 1) the trial judge gave an erroneous jury instruction, and 2) the prosecutor in his closing argument made false representations that warranted a mistrial. The court denied the motion and both were subsequently sentenced. Alvarado and Oqueli both appeal the trial court's denial of their motions for a new trial.

## I. FACTS

On July 22, 1986, Alvarado, Oqueli, Oqueli's son Yuri, and Roberto Katan (Katan) arrived at the Los Angeles airport on a Varig Airlines flight from Brazil. At the luggage carousel, Oqueli picked up Alvarado's suitcase and Yuri's suitcase and proceeded through customs. Oqueli showed the customs agent a diplomatic pass, and the agent allowed Oqueli to pass through without being checked. Oqueli was General Consul for Honduras from January, 1984 to January, 1985. His diplomatic pass had expired with the termination of his post, but the customs agent was unaware of that fact.

Alvarado took Oqueli's brown suitcase and black suitcase from the carousel and went to the customs station. As Alvarado gave the customs agent his flight ticket and other travel documents, she noticed that his hands trembled. With his flight ticket, Alvarado also handed the customs agent an unused Japan Airlines ticket from Brazil to the United States scheduled for three days earlier. Then, without prompting, Alvarado told the customs agent that he was a doctor. Also, Alvarado was well-dressed, yet was carrying a red gym-type zipper bag.

The customs agent found Alvarado's conduct suspicious and decided to refer him to the secondary inspection station for further examination. At secondary, the agent asked to check the black suitcase. Alvarado explained that his friend, Oscar Oqueli, who was standing by the exit with his son and Katan, had the key. A customs agent escorted Alvarado to the exit, and he was given a set of keys by Katan. Upon returning to the secondary check station, Alvarado attempted to open the black suitcase, fumbled with the keys, and dropped them. He explained that these were not the keys to the black suitcase, but instead belonged to the brown suitcase, and offered to open it. The brown suitcase contained only clothes and dental equipment. Alvarado then stated that his friend had the keys to the black suitcase. When asked why he didn't get them the first time, he stated he had forgotten to ask for them. By that time, Oqueli, his son, and Katan had left the airport and could not be located. Alvarado agreed to have the black suitcase opened with a crowbar, but he explained that the suitcase was not his, but Oscar Oqueli's, and that he was not responsible for its contents. When the suitcase was opened, Alvarado immediately turned pale. After moving the clothing around, the customs agent found eleven packages of cocaine at the bottom of the case.

After his arrest, Alvarado told a DEA agent, through an interpreter, that Oqueli

---

[*] Judge Wiggins was randomly selected to replace Judge Solomon as a member of this panel because of the death of Judge Solomon.

owned the black suitcase and that Alvarado did not know about the cocaine. There was conflicting evidence about whether Alvarado said he was paid for taking the suitcase. The interpreter testified that Alvarado said that Oqueli offered to give him a $5,000 gift when he returned to the United States if Alvarado would carry his suitcase. Alvarado testified that there was never any discussion of being paid to carry the suitcase.

After his arrest, Alvarado, in cooperation with the DEA agents, called Oqueli and left a message for him to come to the Marriot Hotel and pick up Alvarado and the suitcases. A few hours later, Oqueli's sister arrived at the hotel. She found Alvarado, and without engaging him in other conversation, asked for change. When he gave it to her, she made a telephone call and left.

Alvarado again called Oqueli and arranged to meet him at the airport. Oqueli arrived at the airport in a taxi with Katan. When the taxi passed by Alvarado, he waved at the occupants. There was no acknowledgment. Oqueli exited the cab a short distance from Alvarado and motioned for Alvarado to remain there. Oqueli then walked to a nearby telephone booth and made a telephone call. At that time, the telephone in the telephone bank nearest Alvarado began to ring. Alvarado let it ring. Oqueli hung up the telephone and walked hurriedly toward Alvarado. He picked up both suitcases and walked hurriedly away. When DEA agents attempted to stop Oqueli, he resisted. Oqueli and Katan were arrested.

After his arrest, Oqueli explained that the black suitcase was his and that he had lent it to Alvarado in Rio. He also said that he was, among other things, in the import-export business in the United States. Oqueli stated that he was unaware of the cocaine in the suitcase.

Alvarado and Oqueli were tried together for importing, conspiring to import, and possessing with the intent to distribute, 12.7 kilograms of cocaine. During their closing arguments, defense counsel asserted that Katan was responsible for placing the cocaine in the suitcase. In response, government counsel asserted that the grand jury was unable to find probable cause to indict Katan. He then implied that defendants' failure to call Katan as a witness was evidence that Katan was not the real culprit. The trial judge sustained an objection to this line of argument. The judge admonished government counsel and instructed the jury that a defendant does not have the burden of calling any witness and that "no inference could be drawn" where a defendant chooses not to call a witness.

After this argument, it was revealed that it was not the grand jury but government counsel who chose not to prosecute Katan. Because of the government's misstatements, the judge gave the following instruction to the jury as requested by the defendants.

Now, we're on our concluding instructions. You'll recall that when the government was arguing that Mr. Katan was not indicted by the grand jury, he had been cleared, sort of, by the grand jury, or words to that effect, I instructed you to disregard that; but I'm going to give you an instruction in addition to that.

You are not to consider Mr. Medrano's, the prosecutor's, argument regarding why Mr. Katan was not charged in this case. Mr. Medrano was wrong when he argued to you in his rebuttal argument that the grand jury did not find probable cause to believe that Mr. Katan had committed a crime. He was also wrong when he argued to you that the grand jury decided not to charge Mr. Katan.

The United States Attorney's Office chose not to prosecute Mr. Katan. The case against Mr. Katan was never presented to the grand jury, so the grand jury was never asked whether there was probable cause to charge Mr. Katan.

After two days of deliberation, the jury asked the court to clarify the relationship between the words "know" and "intent" and the word "cocaine" in the statute. In response, the judge reread his instructions on "knowledge" and "intent" and then

gave an earlier rejected *Jewell* instruction stating:

> Now, the instruction which I originally refused but I'm going to give you now is this: The element of knowledge. It's Devitt and Blackmar's Volume 1, Section 14.09.
>
> The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately—notice I say "deliberately"—closed his eyes to what would otherwise have been obvious to him. A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge.
>
> Stated another way: A defendant's knowledge of a fact may be inferred from willful blindness to the existence of a fact. It's entirely up to you as to whether you find any deliberate closing of the eyes and the inference to be drawn from any such evidence. A showing of negligence or mistake alone is not sufficient to show a finding of willfulness or knowledge. If you find a defendant who you are considering believed what was in the boxes was not a controlled substance, then you must acquit.

Both defense counsel objected to this instruction. The objection was denied.

The jury deliberated for another thirty minutes and then returned a verdict against both defendants on all three counts in the indictment.

Defense counsel moved for a new trial on the ground that the prosecutor made a false misrepresentation during his closing argument, and on the ground that there was no evidence to justify a *Jewell* instruction and the *Jewell* instruction as given was deficient. The trial judge denied the motion for a new trial.

## II. DISCUSSION

### A. *Jewell Instruction*

■ In light of the evidence adduced at trial in this case, the district court's decision to instruct the jury on the doctrine of deliberate avoidance was error. The relevant evidence points to actual knowledge, rather than deliberate avoidance, and therefore does not support the giving of a *Jewell* instruction. *See United States v. Pacific Hide & Fur Depot, Inc.*, 768 F.2d 1096, 1098–99 (9th Cir.1985). *See also United States v. Jewell*, 532 F.2d 697 (9th Cir.) (en banc), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976).

■ "A *Jewell* instruction is properly given only when [the] defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate ignorance." *Pacific Hide*, 768 F.2d at 1098. *See United States v. McAllister*, 747 F.2d 1273, 1275 (9th Cir.1984), *cert. denied*, 474 U.S. 829, 106 S.Ct. 92, 88 L.Ed.2d 76 (1985); *United States v. Henderson*, 721 F.2d 276, 277–79 (9th Cir.1983). The cases in which the facts point to deliberate ignorance are relatively rare. *McAllister*, 747 F.2d at 1275. The instruction should, therefore, be given rarely because of the risk that the jury will convict on a standard of negligence: that the defendant *should* have known the conduct was illegal. *United States v. Garzon*, 688 F.2d 607 (9th Cir.1982). Instead, the facts must support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution. *Pacific Hide*, 768 F.2d at 1098; *McAllister*, 747 F.2d at 1275.

In determining whether a *Jewell* instruction is appropriate in this case, the government must present evidence supporting an inference that Alvarado and Oqueli purposely avoided obtaining actual knowledge that the suitcase contained the cocaine. *See United States v. Nicholson*, 677 F.2d 706, 711 (9th Cir.1982). If the evidence indicates that Alvarado and Oqueli had either actual knowledge or lacked any knowledge of the presence of the cocaine, then giving the *Jewell* instruction was inappropriate.

#### 1. *Gustavo Alvarado*

Alvarado argues the facts established by the government support a finding of actual

knowledge, not deliberate avoidance or lack of knowledge. We agree.

The government claims that the evidence it presented at trial "established a plethora of suspicious circumstances that represented not only conscious avoidance, but strong and persuasive proof of the existence of a conspiracy between the defendants to import cocaine which *could only have been unknown to the defendants because of deliberate ignorance.*" (Emphasis in original). The government points to the following evidence:

1. Alvarado and Oqueli were the last passengers off the plane and the last to pass through the prescreening and control points. The government argued at trial that defendants were hoping that the customs inspectors would be less diligent.

2. Alvarado retrieved and carried from the luggage carousel, not his luggage, but two suitcases belonging to codefendant Oqueli.

3. Alvarado appeared nervous and trembling during his contacts with customs officers.

4. Alvarado had two airplane tickets, one of which he used to fly home on Varig Airlines and was paid for with cash, and a valid, but unused, Japanese Airline ticket. Alvarado testified that Oqueli gave him the Varig ticket. Oqueli denied giving the ticket to Alvarado.

5. Alvarado made inconsistent statements to customs officials about the purpose of his trip. He told the inspector at prescreening that he was returning from Rio de Janeiro alone after a one-week vacation. After his arrest, he told DEA agents he had been on a ten-day trip to Rio for a medical conference. At trial, he testified that he went to Rio with Oqueli to price leather for a contemplated import/export business.

6. Alvarado appeared to avoid opening the black suitcase which contained the cocaine. After he was requested to obtain the keys to open the black suitcase, he presented keys that fit the brown suitcase, not the black one. He readily agreed to open the brown suitcase.

7. Alvarado made inconsistent statements regarding the ownership of the black suitcase. At the secondary search area, he claimed ownership of both the black and brown suitcases and presented the appropriate baggage claim tags. He further stated that he had set the combination on the black suitcase when he purchased it. Later, when he was given a crowbar to force open the black suitcase, he stated that the suitcase was "Oscar's," not his, and that he was not responsible for its contents.

8. After forcing open the black suitcase with a crowbar, Alvarado immediately turned pale even though there was no cocaine yet visible.

9. Alvarado allegedly made a post-arrest statement that he agreed to carry the black suitcase as a favor for a friend and, upon his return to the United States, his friend would give him $5,000 as a gift for carrying the suitcase.

Most, if not all of these facts, point to Alvarado's actual knowledge of the cocaine and his attempt to prevent its discovery. Facts number three and eight, his nervousness and turning pale, by themselves, could support either theory—either that he knew, or was afraid to find out. However, when combined with the other facts, these two facts strongly support actual knowledge. The government's strongest evidence of "conscious avoidance" is Alvarado's alleged post-arrest statement that a friend promised him $5,000 as a gift if he delivered the black suitcase. *See United States v. Suttiswad,* 696 F.2d 645, 651 (9th Cir.1982) (deliberate ignorance instruction proper where defendant was given an airplane ticket, clothing, and a substantial amount of cash to deliver a suitcase to Mr. Tom upon arrival in the United States). However, the evidence on whether this statement was actually made is, at best, contradictory. Even if the statement was made, this fact alone, in light of the other evidence in the case, did not justify the *Jewell*

instruction.[1] Because there is insufficient evidence for a trier of fact to reasonably conclude that Alvarado purposely contrived to avoid learning of the presence of the cocaine, it was inappropriate for the district court to give the *Jewell* instruction. *See Garzon*, 688 F.2d at 609.

### 2. *Oscar Oqueli–Hernandez*

Oqueli also argues that the evidence adduced by the government at trial points toward actual knowledge or guilty conscience and not deliberate avoidance. Once again, we agree.

The government relied on the following evidence to show conscious avoidance by Oqueli:

1. Oqueli carried, not his, but Alvarado's suitcases through customs.

2. Oqueli used an invalid diplomatic passport to pass through customs. Oqueli had been General Consul to the United States from Honduras for one year but his diplomatic pass had expired.

3. Oqueli, along with his son Yuri and Katan, apparently abandoned Alvarado at the airport while Alvarado was being questioned and searched by customs. This was deemed by the government to be suspicious because Alvarado and Oqueli were close friends.

4. Oqueli failed to appear at the Marriott Hotel to retrieve his suitcases at Alvarado's request. However, Oqueli's sister arrived at the hotel, asked Alvarado for change, and without engaging him in any other conversation, left and made a phone call. The government claimed the sister was sent to conduct counter-surveillance on behalf of Oqueli.

5. Oqueli's peculiar method of retrieving his suitcase. Oqueli arrived at the airport in a taxi. It passed by Alvarado. Alvarado waved. Oqueli did not acknowledge. Oqueli exited the cab a short distance from Alvarado, motioned for him to remain where he was, then walked to a nearby telephone booth and made a telephone call. A telephone near Alvarado began to ring.

Alvarado did not answer it. Oqueli hung up and walked hurriedly toward Alvarado. He picked up the suitcases, motioned for Alvarado to follow and walked hurriedly away. When DEA agents attempted to stop Oqueli, he resisted.

6. All of Alvarado's telephone calls attempting to set up a meeting to return the suitcases emphasized Alvarado's desire to relinquish the *black* suitcase to Oqueli. In one telephone call to Oqueli's son Yuri, Alvarado threatened to throw the black suitcase away unless Oqueli appeared.

7. Oqueli, in his post-arrest statement, claimed ownership of the black suitcase, but said "he had loaned it to his friend before boarding the plane on a return trip." However, at trial he asserted the suitcase belonged to him and that its entire contents were his.

These facts, along with the facts relating to Alvarado, point to Oqueli's actual knowledge of the presence of cocaine in the black suitcase and tend to establish a consciousness of guilt. Because there is insufficient evidence for a trier of fact to reasonably conclude that Oqueli contrived to avoid learning of the cocaine, it was inappropriate for the district court to give the *Jewell* instruction. *See Garzon*, 688 F.2d at 609.

### B. *Harmless Error*

 While we find the district court

---

**1.** We find this statement unpersuasive as proof of conscious avoidance because Alvarado specifically referred only to the black suitcase in his alleged post-arrest statement. He carried two of Oqueli's suitcases, one black, one brown. If Alvarado were truly without knowledge of the presence of the cocaine, why did he refer only to the black suitcase and why was he so leary of opening it, but was unconcerned with the brown suitcase. If he had no knowledge or was trying to avoid learning about the cocaine, it would seem he would be equally leary of the brown suitcase.

erred in giving the *Jewell* instruction,[2] we hold the error was harmless. Application of the harmless error doctrine is appropriate where the evidence of guilt is so overwhelming that a conviction is compelled. *See United States v. Beckett,* 724 F.2d 855, 856 (9th Cir.1984) (*Jewell* instruction will be harmless error where the instruction is "logically harmless to [the] defendant beyond any reasonable doubt.") (quoting *United States v. Rea,* 532 F.2d 147, 149 (9th Cir.1976)). As the Supreme Court in *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), stated:

"[O]ur harmless error cases do not turn on whether the defendant conceded the factual issue on which the error bore. Rather, we have held that *Chapman* mandates consideration of the entire record prior to reversing a conviction for constitutional errors that may be harmless."

*Id.* at 3109 (quoting *United States v. Hastings,* 461 U.S. 499 at 509 n. 7, 103 S.Ct. 1974 at 1980 n. 7, 76 L.Ed.2d 96 (1983), citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

Here, it appears to us beyond any reasonable doubt that the error did not affect the verdict. The evidence lucidly demonstrates Alvarado attempted a smokescreen and a shell game to avoid having the black suitcase opened. Oqueli–Hernandez certainly exhibited a peculiar manner of returning for and picking up Alvarado after leaving him stranded at the airport. Moreover, at trial Oqueli–Hernandez admitted the contents of the black suitcase were his. Thus, it is abundantly clear the defendants were traveling together, knew of the cocaine, and joined in an attempt to import the cocaine without its detection. The jury had no choice. A guilty verdict on all counts was compelled.

### C. *Prosecutorial Misconduct*

█ During his closing argument, government counsel asserted that the grand jury chose not to indict Katan. The trial court later learned that it was the

United States Attorney and not the grand jury that decided not to prosecute Katan. The government concedes that the argument made by the prosecutor was factually inaccurate and hence inappropriate. The trial judge read the jury a curative instruction prepared by Alvarado and Oqueli that thoroughly discredited the government's false assertion.

Although the government counsel's misstatements were clearly improper, we do not find that either Alvarado or Oqueli was prejudiced. The trial judge acted quickly, emphatically, and appropriately to neutralize whatever prejudicial effect the misstatements may have caused by issuing the curative instructions. *United States v. Rojas,* 731 F.2d 707, 710 (11th Cir.1984) (prejudice arising from improvident appeal to community interests in closing argument cured by jury instruction); *Cherry v. Jago,* 722 F.2d 1296, 1300 (6th Cir.1983), *cert. denied,* 467 U.S. 1244, 104 S.Ct. 3518, 82 L.Ed.2d 826 (1984) (admittedly improper remarks not grounds for reversal in light of curative instructions). Consequently, the misstatements were harmless error in the context of the entire trial.

The district court is, therefore,

AFFIRMED.

CANBY, Circuit Judge, concurring in part and dissenting in part:

I concur in all portions of Judge Anderson's amended opinion except that which finds the *Jewell* instruction to have been harmless error with regard to defendant Alvarado. As the amended opinion correctly states, we may find the error harmless beyond a reasonable doubt only if the evidence was so overwhelming that a conviction was compelled. While there was certainly sufficient evidence for the jury to convict Alvarado, I cannot say that the evidence *compelled* such a result. The jury could rationally have chosen to believe Alvarado's statements that the black bag was Oqueli's and that he, Alvarado, did not know its contents. Indeed, *something* kept the jury deliberating for two days before

---

**2.** Because we find the district court erred in giving the *Jewell* instruction, we do not reach the issue whether the *Jewell* instruction given in this case misstated the law.

the *Jewell* instruction was given. I would therefore reverse Alvarado's conviction and remand for a new trial.

Oqueli's behavior in picking up the suitcases after Alvarado's arrest, on the other hand, can only be consistent with guilt. I therefore agree with the majority that his conviction should be affirmed.