**UNITED STATES of America, Appellee,**

v.

**MANG SUN WONG, Chi Hong Lam and Hang Fang Ko, Defendants,**

**Mang Sun Wong, Defendant–Appellant.**

No. 1278, Docket 88–1100.

United States Court of Appeals,
Second Circuit.

Argued July 22, 1988.

Decided June 1, 1989.

Petition for Rehearing Denied
Sept. 5, 1989.

Emily Berger, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Catherine E. Palmer, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Joel B. Rudin, New York City (Mass & Rudin, New York City, of counsel), for defendant-appellant.

Before ALTIMARI and MAHONEY, Circuit Judges, and KORMAN,[*] District Judge.

MAHONEY, Circuit Judge:

Mang Sun Wong appeals from a judgment of conviction, entered on a jury verdict in the United States District Court for the Eastern District of New York, Raymond J. Dearie, *Judge,* of conspiracy to possess with intent to distribute, and to distribute, in excess of one kilogram of heroin in violation of 21 U.S.C. §§ 841(a) (1982), 841(b)(1)(A)(i) (1982) and 846 (1982); and attempted possession with intent to distribute in excess of one kilogram of heroin in violation of the above statutes and 18 U.S.C. § 2 (1982). Wong was sentenced to two concurrent ten year terms of imprisonment.

Wong raises the following claims on appeal: (1) that the trial court erred in submitting a conscious avoidance charge to the jury; (2) that the government improperly elicited opinion testimony from an agent of the Drug Enforcement Administration and improperly exploited this testimony in summation; and (3) that the selection of the petit jury by a magistrate violated Wong's constitutional rights.

We affirm.

### Background

On December 31, 1986, agents of the Drug Enforcement Administration ("DEA") arrested Mario Sousa Silva at San Francisco International Airport after a routine United States Customs Service examination revealed that Silva had approximately 9½ pounds of heroin secreted behind false walls in two suitcases. Silva had stopped in San Francisco, en route to New York, on a flight from Hong Kong. After his arrest, Silva informed the DEA agents that he had received the heroin in Hong Kong from his supplier, Luis Sousa. Silva further stated that Sousa had instructed Silva to bring the heroin to New York, check into the Sheraton Hotel near LaGuardia Airport, and call Sousa, who would then arrange for a person to pick up the heroin at Silva's hotel room. Silva agreed to assist the agents in a "controlled delivery" of the heroin in New York.

Silva then flew to New York accompanied by two DEA agents. Upon arrival in New York early on the morning of January 1, 1987, DEA agents replaced the 9½ pounds of heroin in the suitcase with white flour and a representative sample of the original heroin. DEA agents then took Silva to the Sheraton LaGuardia Hotel (the "Sheraton"), where he checked into Room 221. The agents checked into an adjoining room and wired Silva's room for sound. In accordance with his instructions, Silva then telephoned Sousa in Hong Kong. Sousa advised Silva that Silva would be contacted about the packages that evening. At approximately 7:30 p.m., Silva received a telephone call from a man who spoke English with a Chinese accent, and stated that he would come to the hotel shortly. The weather that evening was extremely inclement, with heavy snow, rain and ice. Vehicle traffic was scarce throughout the day and evening.

At approximately 9:30 p.m., surveillance agents observed Mang Sun Wong drive a station wagon, and Chi Hong Lam[1] drive an Oldsmobile, to a corner approximately two blocks from the Sheraton. The two vehicles stopped for approximately two

---

* The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

1. Chi Hong Lam, a codefendant, pled guilty to the conspiracy charge prior to trial and was sentenced to nine years imprisonment.

minutes in a "side-by-side" fashion, and Lam and Wong appeared to speak briefly.

Lam then drove to the parking lot of the Sheraton, and Wong followed to the entrance of the lot, hesitated there, then backed out and drove to a side street approximately two blocks from the hotel. Wong remained parked on this side street for several minutes, with the headlights of his vehicle extinguished and its engine running. Wong then drove to another location a few blocks away and again parked the station wagon, extinguished its headlights and kept the engine running.

Meanwhile, Lam entered the Sheraton and proceeded to Silva's room, where Lam took the two suitcases containing the sham heroin and gave Silva a brown paper bag containing $13,000 in United States currency, all in $20 denominations. Lam then left the hotel, went to the hotel parking lot and placed the two suitcases in the trunk of the Oldsmobile.

Lam then drove the Oldsmobile from the Sheraton parking lot to the location where Wong was waiting in the station wagon, and slowly passed Wong's vehicle. Wong then followed Lam, and the two men drove in an erratic manner for the next several minutes, repeatedly "squaring" blocks and speeding up and slowing down, despite the hazardous weather conditions. Lam and Wong then moved their cars next to each other and spoke briefly. They then separated and drove in opposite directions. Lam drove to a nearby McDonald's restaurant and waited for fifteen minutes in the parking lot. Wong also drove to the McDonald's, hesitated, then drove approximately a block away and stopped briefly. Wong then entered the Brooklyn–Queens Expressway and drove into Manhattan.

Soon thereafter, Lam left the McDonald's parking lot and also drove into Manhattan. Lam made two calls from public telephones before parking and entering an apartment house in lower Manhattan, leaving the sham heroin in the trunk of the Oldsmobile, which DEA agents kept under surveillance.

Meanwhile, DEA agents followed Wong as he drove into lower Manhattan. After squaring several blocks there, Wong drove through the Holland Tunnel into New Jersey, where he headed south on the New Jersey Turnpike. Wong was eventually stopped and arrested as he neared Trenton, New Jersey. In a consent search of Wong's automobile, DEA agents recovered $12,280 in United States currency, all in twenty dollar bills, in a brown paper bag in the front seat of the car. The car also contained large quantities of raw fish, shrimp and vegetables. DEA agents subsequently found $2,143 in cash on Wong's person.

After being advised of his rights, Wong told DEA agent Albert LaMagna that he had been to Chinatown, purchased groceries there for his sister's restaurant in Dover, Delaware, and was on his way to Dover to deliver the groceries. When asked if he had been near the LaGuardia Airport earlier that evening, Wong told LaMagna that he had accompanied Lam,[2] who was an acquaintance, to the vicinity of the airport. Wong explained that Lam had asked Wong to accompany Lam to the Sheraton, where Lam was meeting an unidentified friend. When questioned about the money in his possession, Wong stated that Lam had asked Wong to hold the money at the time Lam asked Wong to accompany Lam to the Sheraton, and Wong had agreed to do so, although Lam gave Wong no instructions concerning the disposition of the money. Wong also stated that after Lam had left the Sheraton, Lam had pulled Wong to the side of the road and told him to go home because they were being followed.[3]

The following exchange took place during LaMagna's cross examination by defense counsel:

2. According to LaMagna's testimony, Wong initially provided a false name, "Mr. Chin," for Lam.

3. The evidence of these statements by Wong was provided by the testimony of DEA agent LaMagna. Wong did not testify or offer any evidence in his defense. Wong moved to suppress both the physical evidence seized and oral statements made at the time of his arrest, but that motion was denied, and the denial is not challenged on this appeal.

Q Are you contending the $2,065 was used in a drug transaction, Officer?

A The 2,000 something found on Mr. Wong?

Q Yes.

A I am not can tending [sic] that that particular money was used in a drug transaction.

Q Thank you, Officer.

Now, the money found in the paper bag or on the front seat, wherever your officers say it was, are you contending that that money was used in the drug transaction that took place in the Sheraton LaGuardia Hotel?

A I am not contending that it was used in the drug transaction which took place. I am contending—

Q Thank you, Officer.

Ms. PALMER [prosecutor]: Objection, your Honor. May he finished [sic] the answer to the question?

THE COURT: He answered the question. Go ahead. the next question.

Q And in fact, at the time that money, that money in the brown paper bag, whatever, was found on Mr. Wong down by Exit 8 on the New Jersey turnpike, the drug transaction in the Sheraton LaGuardia Hotel had long been completed, hadn't it, Officer?

A It depends on the definition of "long". If you are saying—

Q Officer, at the time that you took that money off Wong had money and drugs already been previously exchanged between Lam and Socia (ph) in the Sheraton Hotel?

A Yes, they had.

Q Thank you.

A further exchange on the same subject occurred during LaMagna's redirect examination, as follows:

Q Now, Agent LaMagna, could you tell us what you are contending the $12,-280 found on the front seat of Mr. Wong's vehicle—

MR. BURNS [defense counsel]: Objection—

Q (Continuing.)—was?

MR. BURNS: The evidence speaks for itself, Judge.

THE COURT: Mr. Burns, you inquired on this during your cross-examination, and I think it's an appropriate question. Go ahead.

A Yes.

I believe that the money was to be used as part of the drug transaction.

Q Could you explain that to us, please?

A Yes. In my—

MR. BURNS: Judge, can we approach, please?

After extensive colloquy, the district court precluded any further inquiry on this subject.

In summation, defense counsel stated that LaMagna "was not contending [the $2,143 found on Wong's person] was used in a drug transaction," and "admits that the [$12,280 found in the brown paper bag] was not used in a drug transaction in Room 221 at the Sheraton LaGuardia Hotel; that all Mr. Wong is doing is holding money for Mr. Lam." In its rebuttal summation, the government stated:

And again, take a look at Agent LaMagna's testimony. Mr. Burns said, well, Agent LaMagna told you that that money was not part of what happened in Room 221.

Of course, ladies and gentlemen, the twelve thousand never went into Room 221. But, ladies and gentlemen, also take a look at Agent's LaMagna's testimony when he was asked the question, the following question. I am sorry.

Agent LaMagna was asked the following question about that money. He said, now, Agent LaMagna, could you tell us what you are contending the twelve thousand two hundred and eighty dollars found on the front seat of Mr. Wong's vehicle—

Answer: Yes. I believe that the money was to be used as part of the drug transaction.

Not what happened in the hotel room, ladies and gentlemen.

MR. BURNS: Can we approach?

MS. PALMER: But the drug transaction—

MR. BURNS: Can we approach?

THE COURT: No. Objection overruled.

Finally, LaMagna's testimony, including its disputed portions, was read back to the jury at its request during the jury's deliberations.

The prosecution contended that Wong had hired Lam as a courier to pick up the heroin; *i.e.*, that Wong was going to pay Lam the $12,280 found in the brown paper bag in Wong's car as a courier fee in exchange for the heroin. This transaction was aborted, according to the government, because Wong and Lam detected that they were under surveillance.

Wong claimed that he innocently accompanied Lam from Manhattan to the Sheraton, intending to have dinner with Lam after Lam met a friend Wong did not know at the hotel. In addition, Wong's counsel stressed the lack of direct evidence linking Wong to the heroin transaction at issue. He repeatedly reminded the jury that the sole basis for Wong's arrest was that Wong had followed Lam to the Sheraton and was nearby when a narcotics transaction occurred. Finally, Wong's counsel told the jury during summation that "mere presence at or about a scene where a crime is committed is not a crime. Mere knowledge of an individual who has committed a crime is not a crime."

Over appellant's objection, the district court provided the following "conscious avoidance" instruction to the jury:

> [O]ne may not willfully and intentionally remain ignorant [sic] of a fact material and important to his conduct in order to to [sic] escape the consequences of the criminal law. If you find beyond a reasonable doubt that the defendant Wong was aware that there was a high probability that the co-defendant Lam was attempting to obtain narcotics, but Wong deliberately and consciously avoided confirming this fact, then you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge, unless you find that the defendant Wong believed that the co-defendant Lam was not attempting to obtain narcotics.

I should like to emphasis [sic] that the necessary knowledge can not be established by showing you are [sic] carelessness, negligence, or even foolishness on the part of the defendant.

This instruction was repeated during the jury's deliberations, when the jury requested an explanation of the law concerning the second count of the indictment.

### Discussion

**A. The Conscious Avoidance Charge.**

■ Wong argues that there was no evidentiary basis for giving the conscious avoidance charge. We disagree.

"The conscious avoidance charge commonly has been used where a defendant has claimed lack of some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance." *United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir.) (citing cases), *cert. denied*, 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986). The charge is appropriately given where "the surrounding circumstances were such that reasonable persons could have concluded that the circumstances alone should have apprised defendant[ ] of the unlawful nature of [his] conduct." *United States v. Guzman*, 754 F.2d 482, 489 (2d Cir.1985) (citing *United States v. Mohabir*, 624 F.2d 1140, 1154 (2d Cir.1980)), *cert. denied*, 474 U.S. 1054, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986). Applying this standard, we find no error with the instruction given here.

■ Throughout the trial, Wong's counsel argued that Wong lacked the knowledge necessary for conviction. In his opening and closing statements, Wong's counsel claimed that Wong, innocently and without knowledge of the impending narcotics transaction, accompanied Lam to the Sheraton in furtherance of plans to have dinner with Lam later that evening.

Having found knowledge contested by the defendant, we must now determine whether the evidence supported the conscious avoidance charge. *See Lanza*, 790 F.2d at 1022. More precisely, we must determine whether:

the government produced sufficient evidence here to justify a reasonable juror in concluding that if appellant was not aware of the essential nature of the conspiracy, it was only because he was consciously shutting his eyes to such knowledge.

*Mohabir,* 624 F.2d at 1154.

As summarized above, the government presented evidence that Wong followed Lam to the Sheraton, had a brief conversation with Lam before the drug transaction, waited in his car while that transaction occurred, followed Lam afterwards until they held a further conversation in which Lam advised Wong to depart because they were being followed, and then, when later apprehended in New Jersey with $12,280 in a brown bag in his automobile, claimed that he had followed Lam to Queens because Lam was going to see a friend and had asked Wong to accompany him, and had been given the $12,280 by Lam without any instructions as to its disposition.

Wong argues that this evidence, from which the jury could infer knowledge, points to his actual knowledge of the narcotics transaction, and no evidence was presented to show that he purposely avoided learning the truth. Wong correctly points out that the government's primary theory of the case was not that Wong consciously avoided the truth, but rather that he had hired Lam as a courier and had full knowledge of the drug exchange transacted by Lam and Silva at the Sheraton.[4] Wong argues, citing several Ninth Circuit cases, that where there is "no evidence [to] suggest[ ] a middle ground of conscious avoidance," submitting such an instruction to the jury is error. *United States v. Garzon,* 688 F.2d 607, 609 (9th Cir.1982); *see*

*United States v. Alvarado,* 838 F.2d 311, 315–16 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2880, 101 L.Ed.2d 915 (1988); *United States v. Beckett,* 724 F.2d 855, 859 (9th Cir.1984) (per curiam).

It will almost inevitably be the case that a prosecutor seeking a conscious avoidance charge will contend, in the alternative, that the defendant's culpable knowledge has been directly established. Accordingly, the fact that the government primarily contended that Wong had actual knowledge of the heroin transaction does not lead to the conclusion that the conscious avoidance charge was improper. Further, the evidence of Wong's (1) remaining at the periphery of the transaction and (2) claim of having received $12,280 from Lam without instructions as to its disposal, together with Wong's defense that he did not know that a crime was being committed and had no part in it, sufficed to justify the instruction. *See United States v. Dozier,* 522 F.2d 224, 226–27 (2d Cir.) (conscious avoidance charge proper where defendant was never seen with narcotics, and claimed she innocently accompanied her companion without knowledge that companion was selling narcotics), *cert. denied,* 423 U.S. 1021, 96 S.Ct. 461, 46 L.Ed.2d 394 (1975); *see also United States v. Picciandra,* 788 F.2d 39, 46 (1st Cir.) ("Any reasonable person would have realized that in today's society the bizarre bearing of shopping bags filled with large sums of cash signalled some form of illegal activity."), *cert. denied,* 479 U.S. 847, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986).

The Ninth Circuit cases cited by appellant, which of course we are not bound to follow,[5] are distinguishable. For example, *Alvarado* determined that there was insufficient evidence that defendants conscious-

---

**4.** The prosecutor's complete comment about conscious avoidance was stated in rebuttal summation as follows:

And, ladies and gentlemen, if you have any doubt in your minds, listen finally to the charge of the Court that the Judge will give you about a charge about whether or not given all these highly unusual circumstances it is sufficient for Mr. Wong just to close his eyes and say, I didn't know that was going on, when all the evidence shows very clearly that he knows what is going on, and leaves no doubt, ladies and gentlemen, that the evidence

has shown that Mr. Wong is guilty of the crimes charged in the indictment.

**5.** The Second and Ninth Circuits arguably have different views concerning use of the "conscious avoidance" charge. *Compare United States v. Lanza,* 790 F.2d 1015, 1022 (2d Cir.) ("conscious avoidance charge commonly has been used where a defendant has claimed lack of some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance") (citing cases), *cert. denied,* 479 U.S. 861, 107 S.Ct. 211, 93

ly avoided knowledge that a suitcase they carried on an international plane trip contained cocaine to warrant the instruction, but affirmed their convictions because the proof of actual knowledge rendered the instruction harmless error. 838 F.2d at 314–17. *Beckett* and *Garzon* both involved defendants who were present in the room where a drug sale took place. As the court said in *Garzon:*

> the choice for the jury was whether appellant knowingly participated in the drug deal or was merely innocently present at the final meeting. No evidence suggested a middle ground of conscious avoidance.

688 F.2d at 609; *see Beckett*, 724 F.2d at 856.

Here, on the contrary, Wong was not present in the hotel room where the controlled delivery of heroin took place. Rather, Wong waited outside in his car with the engine running, holding a large amount of cash. Wong then drove away in a surveillance-conscious manner after being told that he might be under surveillance. The jury could have inferred that Wong chose to stay in his car to avoid detection either because he knew that Lam was picking up heroin, or because he was purposely avoiding knowledge of the truth. In other words, the government presented "evidence 'that the defendant purposely contrived to avoid learning all of the facts in order to have a defense in the event of being arrested and charged.'" *Garzon*, 688 F.2d at 609 (quoting *United States v. Murrieta–Bejarano*, 552 F.2d 1323, 1326 (9th Cir.1977) (Kennedy, J., concurring in part and dissenting in part)). The conscious avoidance charge was accordingly proper.

**B.** *Admission and Use in Rebuttal Summation of Challenged Testimony by Agent LaMagna.*

As described earlier herein, the government was allowed on redirect examination to elicit from DEA agent LaMagna his belief that the $12,280 found in a brown bag in the front seat of Wong's automobile "was to be used as part of the drug transaction," after defense counsel obtained from LaMagna on prior cross examination the concession that this money was not "used in the drug transaction that took place in the Sheraton LaGuardia Hotel." In addition, after defense counsel contended in summation that LaMagna "admits that the $12,280 found in the brown paper bag was not used in a drug transaction; that all Mr. Wong is doing is holding money for Mr. Lam," government counsel responded in rebuttal summation by reading LaMagna's testimony that "the money was to be used as part of the drug transaction." Wong contends that it was error to allow the question and answer on redirect examination, which error was compounded by its use in the government's rebuttal summation, because it constituted impermissible opinion testimony. We disagree.

It is well settled that the operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Evid. 702, that the decision to admit such testimony is vested in the broad discretion of the district court, and that the district court's ruling will be sustained unless manifestly erroneous. *See United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). There is force, however, in Wong's contention that LaMagna was drawing conclusions from the evidence, rather than merely testifying to the jargon and practices of the drug trade. *See United States v. Garcia*, 848 F.2d 1324, 1335 (2d Cir.1988), *cert. granted*, —— U.S. ——, 109 S.Ct. 782, 102 L.Ed.2d 773 (1989); *Nersesian*, 824 F.2d at 1308; *United States v. Brown*, 776 F.2d 397, 400–01 (2d Cir.1985), *cert. denied*, 475 U.S. 1141,

---

L.Ed.2d 141 (1986), *with United States v. Alvarado*, 838 F.2d 311, 314 (9th Cir.) ("cases in which the facts point to deliberate ignorance are relatively rare"), *cert. denied*, —— U.S. ——, 108 S.Ct. 2880, 101 L.Ed.2d 915 (1988); *United States v. Garzon*, 688 F.2d 607, 609 (9th Cir.1982) (same).

Both circuits, however, require that for the instruction properly to be given, the defendant must claim a lack of culpable knowledge and the proof at trial must support an inference of deliberate ignorance. *See e.g., Lanza*, 790 F.2d at 1022; *Alvarado*, 838 F.2d at 314.

106 S.Ct. 1793, 90 L.Ed.2d 339 (1986). In any event, we would have difficulty concluding that the single question and answer that occurred on redirect examination posed the danger that "uncontrolled ... use of expert testimony may have the effect of providing the government with an additional summation by having the expert interpret the evidence." *Nersesian,* 824 F.2d at 1308 (citing *Brown,* 776 F.2d at 401).

Here, furthermore, Wong's counsel opened the door to LaMagna's testimony by inquiring on cross examination whether LaMagna was "contending" that the $12,280 was "used in the drug transaction that took place in the Sheraton." Wong's counsel cut LaMagna off after eliciting a negative response, as he was entitled to do. The government's redirect examination simply continued the inquiry by asking LaMagna what he *was* contending about the $12,280, which elicited the response: "I believe that the money was to be used as part of the drug transaction." The district court did not allow this line of examination to proceed any further.

We believe this situation to be governed by the rule recently reiterated in *United States v. Wiley,* 846 F.2d 150 (2d Cir.1988):

> Redirect examination may be used to rebut false impressions that arise from cross-examination, *cf. United States v. Martinez,* 775 F.2d 31, 37 (2d Cir.1985), and the scope of such an examination is a matter confided to the district court's discretion, *see United States v. Lubrano,* 529 F.2d 633, 637 (2d Cir.1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 61, 50 L.Ed.2d 78 (1976).

*Id.* at 156.

The case is even clearer with respect to the rebuttal summation. The defense summation not only quoted the LaMagna concession that the $12,280 was not used in the transaction at the Sheraton, but attributed to LaMagna an admission "that all Mr. Wong is doing is holding money for Mr. Lam." This attribution went well beyond the record, and certainly justified the government in reading LaMagna's testimony on redirect examination in its rebuttal summation. *See United States v. Torres,* 845 F.2d 1165, 1172 (2d Cir.1988); *United States v. Resto,* 824 F.2d 210, 212 (2d Cir. 1987).

### C. *Jury Selection by a Magistrate.*

■ Wong's final claim is that, even though Wong consented, the selection of the jury by a magistrate was plain error and requires reversal of the conviction. We disagree.

In *United States v. Garcia,* 848 F.2d 1324 (2d Cir.1988), *cert. granted,* — U.S. ——, 109 S.Ct. 782, 102 L.Ed.2d 773 (1989), after thorough consideration of the statutory and constitutional issues, we concluded that a district judge may delegate jury selection to a magistrate, stating:

> [E]ven absent a defendant's consent the Federal Magistrates Act permits district courts to delegate the task of jury selection in felony cases to a magistrate. Additionally, such a delegation does not contravene Article III of the Constitution where, as here, the district court affords *de novo* review of unsustained challenges to jurors for cause.

*Id.* at 1332–1333.

Here, furthermore, Wong concededly consented to the magistrate's conduct of the *voir dire.* Thus, in addition, to our holding in *Garcia,* Wong's consent renders this claim meritless. *See United States v. Ford,* 824 F.2d 1430, 1438–39 (5th Cir.1987) (*en banc*) (although error to allow magistrate to preside over jury selection during federal felony trial, error rendered harmless by defendant's failure to object), *cert. denied,* — U.S. ——, 108 S.Ct. 741, 98 L.Ed.2d 776 (1988).

### *Conclusion*

The judgment of conviction is affirmed.

### ORDER ON PETITION FOR REHEARING

The panel's unanimous opinion, filed June 1, 1989, rejected appellant Wong's contention that the selection of his jury by a magistrate was plain error requiring reversal of his conviction. We did so (1) in

reliance upon *United States v. Garcia*, 848 F.2d 1324 (2d Cir.1988), *reversed sub nom. Gomez v. United States*, — U.S. —, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989), where the jury was selected by a magistrate over the defendant's objection; and (2) on the basis that Wong's consent to the magistrate's conduct of the *voir dire* precluded a finding of reversible error.

As the citation above indicates, *Garcia* was unanimously reversed by the Supreme Court on June 12, 1989, eleven days after the filing of the original panel opinion in *Mang Sun Wong*. Wong has now filed a petition for rehearing, contending that (1) our reliance upon *Garcia* is no longer viable, and (2) the Supreme Court's decision in *Gomez* also precludes affirmance of Wong's conviction on the basis that he consented to the magistrate's conduct of the *voir dire*.[1] The first proposition is hardly debatable, but we disagree with the second.

Wong points to the following language from *Gomez* as requiring reversal of his conviction:

> Among those basic fair trial rights that " 'can never be treated as harmless' " is a defendant's "right to an impartial adjudicator, be it judge or jury." *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622 (1987) (quoting *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967)). Equally basic is a defendant's right to have *all critical stages of a criminal trial conducted by a person with jurisdiction to preside.* Thus harmless-error analysis does not apply in a felony case in which, *despite the defendant's objection* and without any meaningful review by a district judge, an officer *exceeds his jurisdiction* by selecting a jury.

109 S.Ct. at 2248 (emphasis added).

Specifically, Wong contends that the requirement that jury selection be conducted by "a person with jurisdiction to preside," coupled with the Court's earlier determination that the Federal Magistrates Act does not empower magistrates to select juries in felony cases, 109 S.Ct. at 2245–47, require reversal of his conviction despite his consent to the magistrate's selection of his trial jury.

The passage quoted above, however, was addressed to the government's contention in *Gomez* that despite the defendant's objection to the selection of his jury by a magistrate, the error resulting from that selection was harmless because no specific prejudice was shown. As the quoted passage indicates, the Supreme Court limited its ruling to the situation in which a magistrate selects a jury "despite the defendant's objection." The Court introduced its opinion, moreover, with the statement that "[t]he principal question presented is whether [a magistrate's] presiding at the selection of a jury in a felony trial *without the defendant's consent* " is authorized by the Federal Magistrates Act. 109 S.Ct. at 2239 (emphasis added).

Furthermore, the Court was fully aware of cases, including *United States v. DeFiore*, 720 F.2d 757, 764–65 (2d Cir.1983), *cert. denied*, 446 U.S. 906, 104 S.Ct. 1684, 80 L.Ed.2d 158 (1984),[2] in which affirmance of a felony conviction was premised upon a defendant's failure to object to the selection of the jury by a magistrate. *See Gomez*, 109 S.Ct. at 2240 nn. 6 & 7. Indeed, the Court granted certiorari in *Gomez* to resolve the conflict between our ruling in *Garcia* and *United States v. Ford*, 824 F.2d 1430 (5th Cir.1987) (in banc), *cert. denied*, 484 U.S. 1034, 108 S.Ct. 741, 98 L.Ed.2d 776 (1988), in which the Fifth Circuit *affirmed* a felony conviction, despite finding that the Federal Magistrates Act did not authorize jury selection by a magistrate, because the defendant "did not ob-

---

1. Wong also contends that his consent was not knowingly and voluntarily given and was procedurally defective. After review of the record, we find no merit in these contentions.

2. We must, of course, defer to *DeFiore* unless it is overruled by the Supreme Court or this court in banc. *See United States v. Ianniello*, 808 F.2d 184, 190 (2d Cir.1986), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987); *Board of Educ. of City School Dist. v. Hufstedler*, 641 F.2d 68, 70 (2d Cir.1981).

**1546**

ject and the trial was fundamentally fair." 824 F.2d at 1439.

In view of the foregoing, we do not read *Gomez* as requiring reversal of a felony conviction where, as here, there was not only a failure to object, but explicit consent, to the magistrate's selection of a jury. *Gomez* makes clear that a magistrate's performance of this function is not authorized by the Federal Magistrates Act, and that it is accordingly error to allow it to occur. In view, however, of the Supreme Court's explicit limitation both of the question presented and the ruling stated in *Gomez*, we are not required by that case to conclude that the error requires reversal where consent is given, and we decline to do so on this record.

The petition for rehearing is denied.

It is further noted that the suggestion for rehearing in banc has been transmitted to the judges of the court in regular active service and to any other judge that heard the appeal and that no such judge has requested that a vote be taken thereon.

ALTIMARI, Circuit Judge, dissenting from the denial of rehearing.

I respectfully dissent.

Although the question presented to the Supreme Court in *Gomez v. United States* was whether nonconsensual jury selection by a magistrate in a felony trial is permissible under the Federal Magistrates Act, the task to which the Court set itself was to "consider the office of magistrate as it pertains to seating a jury in a felony case." — U.S. —, —, 109 S.Ct. 2237, 2242, 104 L.Ed.2d 923 (1989). Thus, simply stated, the focus of the Court was on the powers of a magistrate. The majority holds that reversal is not required in the instant case because Mang Sun Wong consented to jury selection by a magistrate. In view of the principles expressed in *Gomez*, I believe that a magistrate has no power to seat a jury in a felony case with or without the defendant's consent.

Congress amended the Federal Magistrates Act to "'clarify and further define the additional duties which may be assigned to a United States Magistrate.'"

*Gomez*, — U.S. at —, 109 S.Ct. at 2243, (quoting H.R.Rep. No. 94–1609, p. 2 (1976) U.S.Code Cong. & Admin.News 1976, pp. 6162, 6162). Surely there is a distinction between "additional duties" and "additional powers." *Gomez* instructs that neither the additional duties clause of the statute nor Congressional intent invests a magistrate with the power to select a jury in a felony trial. *See id.* — U.S. at —, — n. 25, 109 S.Ct. at 2244, 2246 n. 25 ("the Federal Magistrates Act does not *allow* the delegation of jury selection to magistrates") (emphasis added). Jurisdiction to preside at felony trials remains the province of district judges.

The majority's analysis, whether denominated plain or harmless error, is simply inappropriate here. I am persuaded by *Gomez* to look no further than to the powers of the magistrate's office. Because I believe the consent of the defendant cannot enlarge those powers of office not granted by the Federal Magistrates Act, in my view, defendant's conviction must be reversed.