848 F.2d 1324
 56 USLW 2772, 25 Fed. R. Evid. Serv. 1419
 UNITED STATES of America, Appellee,
v.
Jose Danery GARCIA, Damaris Sanchez, William Salazar, Fabio
Porras, Diego Chavez-Tesina, Adela Gomez, Beimar
Vallejo, Jose Gomez, Jaime Newbold,
Yolanda Martinez, Hugo
Shanks-Carrera, Defendants,
Diego Chavez-Tesina, Beimar Vallejo, Jose Gomez, Hugo
Shanks-Carrera, William Salazar, Defendants-Appellants.
 Nos. 238 to 242, Dockets 87-1243 to 87-1246 and 87-1264.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 19, 1987.
Decided June 1, 1988.
 
 Thomas E. Nooter, New York City (Freeman, Nooter & Ginsberg, New York City, of counsel), for appellant Beimar Vallejo.
 Joel B. Rudin, New York City (Mass & Rudin, New York City, of counsel), for defendant-appellant Jose Gomez.
 Bert H. Nisonoff, Forest Hills, N.Y., for defendant-appellant Hugo Shanks-Carrera.
 Jerald Levine, Jackson Heights, N.Y., for defendant-appellant Diego Chavez-Tesina.
 Harry C. Batchelder, Jr., New York City, for defendant-appellant William Salazar.
 Sean F. O'Shea, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y.; John Gleeson and Emily Berger, Asst. U.S. Attys., of counsel), for appellee U.S.
 Before OAKES, CARDAMONE and MAHONEY, Circuit Judges.
 CARDAMONE, Circuit Judge:
 This appeal requires us to decide at what stage in a criminal prosecution a defendant is entitled to the presence of an Article III judge. Appellants urge that a defendant may claim such a right at the commencement of jury selection. There is no doubt that everything has its season, and there is a time when an accused is entitled to the presence of a federal district court judge. But that season does not necessarily come with the commencement of the petit jury selection. In this case, a magistrate presided over the jury selection for the trial of appellants, William Salazar, Diego Chavez-Tesina, Beimar Vallejo, Jose Gomez, and Hugo Shanks-Carrera. They appeal from the May, 1987 judgments of convictions entered against them in the United States District Court for the Eastern District of New York (McLaughlin, J.) for narcotics-related offenses.
 
 FACTS
 
 1
 Appellants' convictions are the result of an undercover investigation into a major cocaine distribution network in New York and New Orleans conducted by the Drug Enforcement Administration (DEA). DEA Special Agent Rene de la Cova cultivated an acquaintance with Jose Danery Garcia, who introduced de la Cova to the defendant Salazar. Salazar and Garcia sold de la Cova two-eighths of a kilogram of cocaine on January 15, 1986. About three weeks later, de la Cova asked Salazar to supply 50 kilograms of cocaine for one of de la Cova's customers. Salazar mentioned that his business partner, a Colombian of Japanese descent who had lived in London would soon be visiting New Orleans to inspect a large shipment of cocaine. This description matched the defendant Chavez-Tesina, a resident of New York. In New Orleans, another DEA agent, Douglas Krockenberger, was engaged in a separate undercover operation and encountered Chavez-Tesina, who told the agent that he had agreed to deliver cocaine to New York. As de la Cova and Salazar finalized their deal, Salazar made telephone calls concerning it to Chavez-Tesina's residence in New York.
 
 
 2
 While the large transaction was being arranged, Salazar made or facilitated several other sales of cocaine; only three in particular involved the appellants. On February 6, 1986 Salazar sold one-eighth of a kilogram of cocaine to de la Cova. In another transaction, Salazar contacted the defendant Vallejo and said that he had something "very, very good." Salazar telephoned the defendant Gomez two days later, on March 17, 1986, and asked for "two favors," slang for two kilograms of cocaine, which Gomez agreed to provide. Gomez was seen one hour later carrying a large plastic bag into Salazar's house and later leaving without it. Vallejo was then observed leaving Salazar's house with Salazar. The two drove to Vallejo's house and both entered the house with the bag. Soon thereafter, Salazar exited alone, carrying nothing. Four days later, Vallejo made a small delivery of cocaine to de la Cova and Salazar for their "personal use."
 
 
 3
 The 50 kilogram deal approached execution. After an agent posing as de la Cova's buyer "flashed" a payment of $1.5 million, Salazar led de la Cova to an apartment in a building that was under surveillance by the DEA. The defendant Shanks-Carrera was observed going inside the building with a duffel bag. When Salazar and de la Cova arrived, Salazar entered the building to make sure that the cocaine was there, while de la Cova waited in the car. When he came out five minutes later, Salazar was arrested. Agents then entered the building and arrested Shanks-Carrera, who was hiding in the apartment closet. Agents recovered the duffel bag, which contained ten kilograms of cocaine--the agreed-upon first installment. Chavez-Tesina and Vallejo were both arrested later that day in Queens, New York.
 
 
 4
 Several days later Gomez attempted to contact Salazar but instead reached de la Cova, who was carrying Salazar's beeper after Salazar's arrest. Gomez was arrested after discussing with de la Cova the March 17th transaction between Gomez, Vallejo, and Salazar--and verifying that that transaction involved cocaine--as well as discussing a proposed transaction which he refused to execute without Salazar's permission.
 
 
 5
 Eleven people, including Garcia, were charged in a 21-count superseding indictment. Six of the defendants were charged for alleged narcotics activities involving Garcia. These defendants never went to trial, some pled guilty, or were severed, or (in one case) fled. The five appellants were tried on nine counts of the indictment, the broadest of which alleged that Salazar and Chavez-Tesina conducted a narcotics racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1962(c) (1982) (Count 2). Salazar, Chavez-Tesina, and Shanks-Carrera were charged with conspiracy to possess with intent to distribute and possession with intent to distribute 50 kilograms of cocaine under 21 U.S.C. Secs. 841, 846 (1982 & Supp. IV 1986) (Counts 19 and 20). All but one of the remaining counts involving the appellants dealt with the three separate smaller sales of cocaine in violation of 21 U.S.C. Secs. 841, 846 (1982 & Supp. IV 1986): (1) conspiracy and substantive counts against Garcia and Salazar arising out of the January 15th sale of two-eighths of a kilogram of cocaine (Counts 11 and 12); (2) a substantive count against Salazar arising out of the February 6th sale of one-eighth of a kilogram of cocaine (Count 13); and (3) conspiracy and substantive counts against Salazar, Gomez, and Vallejo arising out of the March 17th sale of two kilograms of cocaine (Counts 15 and 16). Finally, Chavez-Tesina was charged with interstate travel in aid of racketeering under 18 U.S.C. Sec. 1952 (1982 & Supp. IV 1986) (Count 14). Each of the offenses alleged in the non-RICO counts was also charged as a predicate act in the RICO count against Salazar and Chavez-Tesina. Thus, the RICO count incorporated the remaining counts against all of the appellants.
 
 
 6
 Appellants moved unsuccessfully for severance pursuant to Fed.R.Crim.P. 8(b), 12(b), and 14. After jury selection--presided over by a magistrate--trial commenced on February 17, 1987 and concluded with the appellants convicted as follows: Salazar for narcotics racketeering, distribution of cocaine, possession of cocaine with intent to distribute, and conspiracy to distribute cocaine; Chavez-Tesina for narcotics racketeering, illegal interstate travel, possession of cocaine with intent to distribute, and conspiracy to distribute cocaine; Vallejo and Gomez for conspiracy to possess cocaine with intent to distribute and possession with intent to distribute; and Shanks-Carrera for possession of cocaine with intent to distribute. Shanks-Carrera was acquitted on the conspiracy charge. This appeal followed. We affirm.
 
 DISCUSSION
 
 7
 Appellants collectively and individually raise the myriad of issues common in appeals from multiple defendant trials. Although each will be addressed in turn, the principal issue presented is whether a magistrate--rather than a district court judge--may preside during jury selection.
 
 I Jury Selection by a Magistrate
 
 8
 Judge McLaughlin assigned the task of jury selection to a magistrate pursuant to local rules for the Eastern District of New York. E.D.N.Y. Magistrates R. 1 ("Full-time magistrates shall have jurisdiction to discharge the duties set forth in 28 U.S.C. Sec. 636."). Salazar, Chavez-Tesina, and Gomez objected to the delegation at the beginning of voir dire and Salazar renewed his objection after the jury had been selected. The district judge upheld the delegation, but offered objectants de novo review of any challenges to jurors for cause which were not sustained by the magistrate. Because the only juror so challenged had been excused by consent, appellants declined the offer. There is no claim of prejudice from the delegation of the voir dire to the magistrate. Rather, appellants argue that allowing a magistrate to preside at the jury selection in a felony case without a defendant's consent contravenes either the Federal Magistrates Act or Article III of the United States Constitution.
 
 A. Statutory Provisions
 
 9
 In 1968 Congress established the office of United States magistrate, which replaced the office of United States commissioner. Federal Magistrates Act, Pub.L. No. 90-578, 82 Stat. 1107, reprinted in 1968 U.S. Code Cong. & Admin. News 1280 (codified as amended at 28 U.S.C. Secs. 631-639 (1982 & Supp. III 1985)). Controversy soon developed regarding the scope of a magistrate's duties. See, e.g., Wingo v. Wedding, 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974) (magistrates not authorized under the Act to conduct habeas corpus evidentiary hearings). As a result, Congress amended the Federal Magistrates Act in 1976 "to clarify and further define the additional duties which may be assigned to a United States Magistrate in the discretion of a judge of the district court." H.R.Rep. No. 1609, 94th Cong., 2d Sess. 2, reprinted in 1976 U.S. Code Cong. & Admin. News 6162, 6162 [hereinafter 1976 House Report].
 
 
 10
 As amended, 28 U.S.C. Sec. 636(b)(1)(A)[1] provides that a magistrate may hear and determine pretrial matters--with certain enumerated exceptions--subject to reconsideration by a district judge when it is argued that the magistrate's order is clearly erroneous or contrary to law. Under Sec. 636(b)(1)(B),[2] a magistrate may conduct hearings on specified motions and file proposed findings and recommendations with a district judge. These findings and recommendations are subject to de novo determination by a district judge. Finally, Sec. 636(b)(3) provides that "[a] magistrate may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States."
 
 
 11
 Because no contemporaneous objection had been made to the process in United States v. DeFiore, 720 F.2d 757, 765 (2d Cir.1983), cert. denied, 466 U.S. 906, 104 S.Ct. 1684, 80 L.Ed.2d 158 (1984), we left open the question of whether 28 U.S.C. Sec. 636 permits a district judge to delegate to a magistrate the power to preside over jury selection in felony cases. Haith v. United States, 342 F.2d 158, 159 (3d Cir.1965) (per curiam) (failure to object to or claim prejudice from delegation waives right to contest delegation), aff'g 231 F.Supp. 495 (E.D.Pa.1964). Here, contemporaneous objections were made and thus the issue is squarely before us.
 
 
 12
 Our sister circuits are divided on the proper scope of Sec. 636. The Ninth Circuit has held that a magistrate may--consistent with both Sec. 636 and the Constitution--preside over jury selection despite the defendant's objection so long as de novo review is available in the district court. See United States v. Peacock, 761 F.2d 1313, 1318 (9th Cir.), cert. denied, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985); United States v. Bezold, 760 F.2d 999, 1002 (9th Cir.1985), cert. denied, 474 U.S. 1063, 106 S.Ct. 811, 88 L.Ed.2d 786 (1986); see also United States v. Rivera-Sola, 713 F.2d 866, 874 (1st Cir.1983) (approving of delegation in dictum). Recently, the Fifth Circuit sitting en banc determined that it was not Congress' purpose to permit such a delegation under Sec. 636 and that therefore a magistrate may not preside in jury selection over defendant's protests. See United States v. Ford, 824 F.2d 1430, 1438 (5th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 741, 98 L.Ed.2d 776 (1988).
 
 
 13
 The first issue to be resolved is what was the aim of Congress when it enacted Sec. 636. Discussing the "additional duties" provision of Sec. 636(b)(3), Congress stated that
 
 
 14
 [t]his subsection enables the district courts to continue innovative experimentations in the use of [magistrates]. At the same time, placing this authorization in an entirely separate subsection emphasizes that it is not restricted in any way by any other specific grant of authority to magistrates.
 
 
 15
 Under this subsection, the district courts would remain free to experiment in the assignment of other duties to magistrates which may not necessarily be included in the broad category of "pretrial matters".
 
 
 16
 1976 House Report, supra, at 12, reprinted in 1976 U.S. Code Cong. & Admin. News at 6172 (emphasis added); see also S.Rep. No. 625, 94th Cong., 2d Sess. 10 (1976) (same statement).
 
 
 17
 Appellants contend that delegation of jury selection to a magistrate is precluded by a close textual analysis of Sec. 636. They first argue that Congress' purpose was to permit only pretrial matters to fall within Sec. 636(b) and that jury selection, as an integral part of a trial, is not a pretrial matter. In support of their argument, appellants note the reference to "pretrial matters" in the House Report quoted above. But the language of that Report plainly states that the subsection grants to district courts the freedom to experiment beyond duties traditionally categorized as "pretrial." Hence, even assuming arguendo that jury selection falls on the "trial" side of the line between "trial" and "pretrial"--a line that is, at best, often blurred--the legislative history of Sec. 636(b) does not preclude delegation of that task to a magistrate.
 
 
 18
 Appellants next direct attention to provisions of Sec. 636 that allow magistrates to conduct misdemeanor trials, 28 U.S.C. Sec. 636(a)(3) (1982), and jury or nonjury civil trials, id. Sec. 636(c) (1982 & Supp. III 1985), conditioned in each case upon the consent of the parties. As a matter of consistent statutory interpretation, they argue, it cannot have been Congress' objective to allow magistrate selection of juries in felony cases without consent of the parties. Yet conditioning the holding of an entire trial before a magistrate on consent is not conclusive in the context of the separate and distinct function of jury selection. Moreover, the legislative history states in so many words that Congress considered the "additional duties" provision to be broad in scope and unrestricted by "any other specific grant of authority to magistrates." Hence, we reject appellants' textual arguments.
 
 
 19
 We conclude that jury selection delegation to a magistrate is within the scope of Sec. 636(b)(3) and consistent with the Federal Magistrates Act. We are mindful of the familiar canon of construction that requires statutes to be construed so as to avoid constitutional questions. E.g., Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 3252, 92 L.Ed.2d 675 (1986). Nonetheless, "this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication." Id. Here, the legislative will is evident. As the Seventh Circuit stated, "The only limitations on section 636(b)(3) are that the duties be consistent with the Constitution and federal laws and that they not be specifically excluded by section 636(b)(1)." In re Establishment Inspection of Gilbert & Bennett Mfg. Co., 589 F.2d 1335, 1340-41 (7th Cir.), cert. denied, 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979); see also Ford, 824 F.2d at 1441-42 (Rubin, J., dissenting) (only limit on Sec. 636(b)(3) is Constitution or conflicting law).
 
 B. Constitutional Concerns
 
 20
 The remaining question is whether Article III of the United States Constitution precludes a magistrate from presiding over jury selection in a felony case without the defendant's consent. Article III, Sec. 1 of the Constitution provides that the "judicial Power of the United States, shall be vested in one supreme court and in such inferior Courts as the Congress may from time to time ordain and establish." Moreover, it provides salary protection and tenure for judges appointed to federal courts in order to ensure that the judicial branch retains its independence from the two other branches of government. There are two aspects to the separation of powers doctrine--a cornerstone of our federal constitutional structure--that are implicated on this appeal. The first addresses the structural relationship between the three branches of government and the second examines the rights secured to individuals by an independent judiciary. See Schor, 106 S.Ct. at 3256; Pacemaker Diagnostic Clinic, Inc. v. Instromedix, Inc., 725 F.2d 537, 541 (9th Cir.) (en banc) (noting dual components of separation of powers cases), cert. denied, 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).
 
 1. Relationships Between the Three Branches
 
 21
 The first, structural component examines the separate and independent relationship between the judiciary and the other two branches of government. Schor, 106 S.Ct. at 3256. Although separation of powers refers to the division of the federal government into three separate branches, the branches are not unconnected from each other. James Madison argued that "unless these departments be ... blended as to give to each a constitutional control over the others, the degree of separation ... essential to a free government, can never ... be duly maintained." The Federalist No. 48, at 308 (J. Madison) (New American Library ed. 1961).
 
 
 22
 The concept of "blended" branches has been best capsulized by Justice Jackson, who observed how the Constitution diffused power between the three branches to secure liberty, but at the same time contemplated the integration of the three branches so as to have a workable government: "It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Each branch does not exist in its own separate, airtight compartment. In determining whether an act of Congress violates the integrity of one branch the question focuses on "the extent to which" the statute prevents that branch "from accomplishing its constitutionally assigned functions." Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). Such an approach implements separation of powers concerns and also the theory of checks and balances--an integral component of the constitutional structure--which serves to prevent each branch from encroaching on the power of the other. The Federalist, supra, No. 51, at 321-22 (J. Madison).
 
 
 23
 With this background, we turn first to Congress' purpose. Congress aimed through the Federal Magistrates Act to make federal courts more efficient by the expanded use of magistrates. See H.R.Rep. No. 1629, 90th Cong., 2d Sess., reprinted in 1968 U.S. Code Cong. & Admin. News 4252, 4257; Federal Magistrates Act: Hearings before Subcomm. No. 4 of the House Comm. on the Judiciary, 90th Cong., 2d Sess. 81 (1968) (testimony of Sen. Tydings) ("We hope and think that innovative, imaginative judges who want to clean up their caseload backlog will utilize the U.S. magistrates in these areas and perhaps even come up with new areas to increase the efficiency of their courts."). Although laudable, efficiency does not resolve separation of powers concerns, for " 'the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives--or the hallmarks--of democractic government....' " Bowsher v. Synar, 478 U.S. 714, 106 S.Ct. 3181, 3193-94, 92 L.Ed.2d 583 (1986) (quoting INS v. Chadha, 462 U.S. 919, 944, 103 S.Ct. 2764, 2780, 77 L.Ed.2d 317 (1983)).
 
 
 24
 In the instant case, appellants argue that jury selection is an "inherently judicial" task that cannot be delegated to a non-Article III judge. "[G]uided by the principle that 'practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III,' " Schor, 106 S.Ct. at 3256 (quoting Thomas v. Union Carbide Agricultural Prods. Co., 473 U.S. 568, 105 S.Ct. 3325, 3336, 87 L.Ed.2d 409 (1985)), we examine the effect of such a delegation. The Federal Magistrates Act simply enables a district judge to appoint an additional set of eyes and ears to aid in jury selection. At the same time, magistrates are completely subject to Article III judges because the district judges appoint, 28 U.S.C. Sec. 631(a), remove, id. Sec. 631(b), and decide what matters are assigned magistrates, id. Sec. 636(b)(4). Significantly, a trial court is not required to appoint a magistrate to preside over jury selection. Rather, the decision is left entirely to the Article III court's discretion. In sum, the delegation of authority here occurs entirely within the judicial branch, a circumstance which alleviates greatly the underlying structural separation of powers concern with one branch's encroaching upon the power of another. Cf. United States v. Raddatz, 447 U.S. 667, 682-83, 100 S.Ct. 2406, 2415-16, 65 L.Ed.2d 424 (1980) (distinguishing administrative agencies from officers of the court).
 
 
 25
 Even assuming the delegated task itself might be labelled "inherently judicial," Article III concerns are not necessarily implicated when the task is not delegated conclusively to a non-Article III tribunal. See Raddatz, 447 U.S. at 681-84, 100 S.Ct. at 2415-17 (upholding suppression hearing referred to magistrate with review); Mathews v. Weber, 423 U.S. 261, 271-72, 96 S.Ct. 549, 554-55, 46 L.Ed.2d 483 (1976) (upholding social security benefit cases referred to magistrate with review); see also Ford, 824 F.2d at 1444-45 (Rubin, J., dissenting) (rejecting "inherently judicial" argument); United States v. Saunders, 641 F.2d 659, 663 (9th Cir.1980), cert. denied, 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981) (same). So long as the " 'essential attributes' of judicial power are retained in the Art. III Court," see Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 81, 102 S.Ct. 2858, 2876, 73 L.Ed.2d 598 (1982) (plurality opinion of Brennan, J.), the delegation of power in a statute does not contravene Article III.
 
 
 26
 The availability of de novo review in this case vested the ultimate decision regarding the composition of the jury with the trial court. Thus, the trial court retained the inherently judicial power to make the final decision. Significantly, retention by an Article III court of this power has been considered crucial in Article III cases. In Raddatz, for example, the Supreme Court held that referral of a suppression motion to a magistrate under Sec. 636(b)(1) did not violate Article III or the defendant's due process rights. 447 U.S. at 680-81, 684, 100 S.Ct. at 2414-15, 2416. Distinguishing the question of whether final decisionmaking power on a suppression motion could be delegated to a non-Article III tribunal, id. at 681, 100 S.Ct. at 2415, the Court stated that "delegation does not violate Art. III so long as the ultimate decision is made by the district court," id. at 683, 100 S.Ct. at 2416. As Justice Blackmun commented, there is little threat to the independence and authority of the judicial branch "when the district judge--insulated by life tenure and irreducible salary--is waiting in the wings, fully able to correct errors." Id. at 686, 100 S.Ct. at 2417 (Blackmun, J., concurring); see also Northern Pipeline, 458 U.S. at 81-83 (opinion of Brennan, J.) (discussing Raddatz ); Mathews, 432 U.S. at 271, 96 S.Ct. at 554 (final decision remains with judge); Fallon, Of Legislative Courts, Administrative Agencies, and Article III, 101 Harv.L.Rev. 915, 933 (1988) (advocating theory "that sufficiently searching review of a legislative court's or administrative agency's decisions by a constitutional court will always satisfy the requirements of article III").
 
 
 27
 Similarly, the trial judge here was "waiting in the wings" and offered de novo review, which the appellants declined. Nor do appellants claim that de novo review would have been ineffective. Raddatz compels the conclusion that neither delegation of voir dire per se nor delegation under the facts of this case erodes the power and independence of the judiciary. Consequently, we perceive no conflict with the first component of the separation of powers doctrine.
 
 2. Article III Rights
 
 28
 The second component of the separation of powers doctrine safeguards the rights of litigants vis-a-vis the judicial branch. Litigants have a "right to have claims decided before judges who are free from potential domination by other branches of government." Schor, 106 S.Ct. at 3256 (quoting United States v. Will, 449 U.S. 200, 218, 101 S.Ct. 471, 482, 66 L.Ed.2d 392 (1980)). This component most often arises in the context of a litigant's consenting to a non-Article III forum. E.g., Schor, 106 S.Ct. at 3256-57; Pacemaker Diagnostic, 725 F.2d at 541-42. Here, appellants affirmatively objected to the delegation of voir dire to a magistrate, thereby rendering of greater import the second component of the doctrine. In cases where consent is absent the second component requires us to view a delegation of jurisdiction from the perspective of the individuals whose liberty is secured by our tripartite system of government. Although many of the same considerations are necessarily at play in both components of the separation of powers doctrine and although both serve to protect the single overall mission of Article III, cf. Schor, 106 S.Ct. at 3266 (Brennan, J., dissenting) ("In my view, the structural and individual interests served by Article III are inseparable."), each emanates from a different perspective.
 
 
 29
 Applied to the instant case, the second component of the doctrine ensures that whatever right a litigant has to the presence of an Article III judge is effectively safeguarded when jury selection is delegated to a magistrate. While not minimizing the importance of jury selection in the context of a trial, we decline to hold that Article III requires the physical presence of an Article III judge at that precise point in the adjudicatory process. Historically a judge was not required to be present during voir dire or to hear challenges for cause. See Ford, 824 F.2d at 1447 (Rubin, J., dissenting). Appellants argue that an Article III judge is required to be present at trial and refer to cases indicating that trial begins with jury selection. The cases cited focus on a defendant's right to be present at jury selection, see, e.g., Lewis v. United States, 146 U.S. 370, 373-74, 13 S.Ct. 136, 137-38, 36 L.Ed. 1011 (1892), or on when a trial begins for purposes of the Speedy Trial Act, see, e.g., United States v. A-A-A Elec. Co., 788 F.2d 242, 246 (4th Cir.1986), rather than on a right to an Article III judge. Hence, they are inapposite. The point at which trial begins and particular constitutional protections attach can vary with the individual right involved. Cf. Press-Enterprise Co. v. Superior Court of Calif., 464 U.S. 501, 509 n. 8, 104 S.Ct. 819, 823 n. 8, 78 L.Ed.2d 629 (1984) (double jeopardy). Thus, even if we accept appellants' premise that an Article III judge must preside over a trial, it does not necessarily follow that for purposes of Article III trial begins with jury selection.
 
 
 30
 The availability of de novo review alleviates apprehension that a litigant will be deprived of the tangible benefits ensured by a judicial branch that is separate and independent from the remaining two branches of government. Tacitly acknowledging this point, appellants argue that the lack of an Article III judge's physical presence at voir dire is somehow demeaning to potential jurors. We decline to adopt this debatable hypothesis as a justification for a broad constitutional rule.
 
 
 31
 In sum, we hold that even absent a defendant's consent the Federal Magistrates Act permits district courts to delegate the task of jury selection in felony cases to a magistrate. Additionally, such a delegation does not contravene Article III of the Constitution where, as here, the district court affords de novo review of unsustained challenges to jurors for cause.
 
 II Single or Multiple Conspiracy
 
 32
 Salazar argues that the indictment charged him with several conspiracies and that he was prejudiced because the evidence at trial proved only a single conspiracy. The issue of the government's indicting for single versus multiple conspiracies arises frequently in criminal jurisprudence. See, e.g., Kotteakos v. United States, 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946) (convictions reversed because single conspiracy charged, multiple conspiracies proven); United States v. Nersesian, 824 F.2d 1294, 1302-03 (2d Cir.) (evidence properly supported single conspiracy charge), cert. denied, --- U.S. ----, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987); United States v. Miley, 513 F.2d 1191, 1205-07 (2d Cir.), cert. denied, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975); United States v. Borelli, 336 F.2d 376, 378 (2d Cir.1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). Instead of arguing that the government charged a single conspiracy but proved multiple, unrelated conspiracies--a recurring problem on appeal--Salazar contends that the reverse situation fatally impaired his trial.
 
 
 33
 We disagree. Multiple conspiracies exist "unless the evidence of the scale of the operation permit[s] the inference that the persons at a particular level must have known that others were performing similar roles." Miley, 513 F.2d at 1207. The record is devoid of evidence indicating this quantum of knowledge among appellants while involved in the acts that led to their convictions. In fact, were this a case where the government had charged a single conspiracy, we would be hard pressed to find evidence supporting a jury determination that a single conspiracy actually did exist. Cf. Nersesian, 824 F.2d at 1302 (analyzing evidence in conspiracy case). Having previously admonished the government that it must "cease combining in an alleged single conspiracy, criminal acts loosely, if at all, connected," United States v. Bertolotti, 529 F.2d 149, 151 (2d Cir.1975), we should not treat the fact that it heeded such advice in this case with stone-faced indifference. Here, the trial court's failure to charge the jury on single versus multiple conspiracies was not error and Salazar's contrary contention is unpersuasive. This does not mean, of course, that the government may arbitrarily jointly try defendants alleged to have engaged in unrelated conspiracies, for the rules governing joinder and severance still apply.
 
 III Joinder and Severance
 
 34
 Salazar, Shanks-Carrera, Vallejo, and Gomez object to the trial court's denial of their motions for severance. It should be noted initially that all of the counts in the indictment concerning the non-RICO appellants were charged also in the RICO count as predicate racketeering acts against Salazar and Chavez-Tesina. Joinder of these defendants in the same indictment was therefore proper under Fed.R.Crim.P. 8(b), even though multiple conspiracies were charged and even though some defendants were not named in all the conspiracy counts, which also constituted RICO predicate offenses, or in the overarching RICO count. See United States v. Barton, 647 F.2d 224, 239-40 (2d Cir.), cert. denied, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); United States v. Weisman, 624 F.2d 1118, 1129 (2d Cir.), cert. denied, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); United States v. Gallo, 668 F.Supp. 736, 748 (E.D.N.Y.1987), mandamus granted on other grounds, 834 F.2d 283 (2d Cir.1987); United States v. Castellano, 610 F.Supp. 1359, 1396-97 (S.D.N.Y.1985). The only question is whether denial of the Fed.R.Crim.P. 14 motions for severance from the joint trial was a clear abuse of the trial court's discretion. Nersesian, 824 F.2d at 1303.
 
 A. Salazar
 
 35
 The essence of Salazar's argument for severance encompasses the issues of proper joinder under Rule 8(b) and of single versus multiple conspiracies. These arguments were rejected above and need not be discussed further. Salazar also contends that he was prejudiced by the admission of conspiracy evidence that related to parties charged in the indictment, but who were not tried. This is not a severance argument--as appellant contends--but rather a relevance argument. The trial court admitted the evidence on the ground that it was relevant to show the breadth of the "enterprise" that formed the basis for the RICO count and to show Salazar's knowledge and intent, which he had put in issue. The weighing of relevance against prejudice to see where the balance tips is entrusted to the discretion of the trial court. Salazar does not argue that the trial court acted arbitrarily or irrationally. See United States v. Esdaille, 769 F.2d 104, 108 (2d Cir.), cert. denied, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985). Hence, the denial of the severance motion must stand.
 
 B. Shanks-Carrera
 
 36
 Shanks-Carrera urges that the denial of a severance in his case created unfair prejudice, correctly claiming that he was the least implicated in the broad series of transactions that form the nexus of this prosecution. Different degrees of guilt or notoriety among defendants obviously do not mandate separate trials. Nersesian, 824 F.2d at 1304. Further, that Shanks-Carrera was acquitted on the conspiracy count is a strong indication that the jury was capable of separately evaluating each defendant's culpability and that there was no prejudicial "spillover" of evidence. See, e.g., Weisman, 624 F.2d at 1130.
 
 
 37
 In addition, the relatively small number of defendants, the straightforward nature of the proof, the similarity of the charged offenses, and the short trial all support the trial court's determination that the jury was able fairly to weigh the evidence against each defendant. Nor can it be said that the trial court's denial of Shanks-Carrera's motion for severance resulted in "a miscarriage of justice." United States v. Bari, 750 F.2d 1169, 1177 (2d Cir.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). We therefore affirm the denial of Shanks-Carrera's motion for severance.
 
 C. Vallejo and Gomez
 
 38
 For the reasons discussed above concerning Shanks-Carrera's motion for severance, we also affirm the denial of Vallejo's and Gomez's motions for severance.
 
 IV Evidentiary Issues
 A. Rule 105 Limiting Instructions
 
 39
 Vallejo and Gomez assert that the failure to grant a severance coupled with the trial court's limiting instructions unduly impaired their trial. The trial court denied Vallejo's and Gomez's requests that limiting instructions be given contemporaneously with the admission of each piece of physical evidence, delimiting which defendant(s) the evidence was admissible against. Judge McLaughlin did give contemporaneous limiting instructions when co-conspirator statements were admissible against some--but not all--defendants. In addition, the trial court gave a general instruction to the jury in his charge:
 
 
 40
 Some of the charges in this case have been made against some of the defendants and not against others. You must decide what the evidence shows about each defendant without considering any evidence that may have been received solely against some other defendant or defendants.
 
 
 41
 Each defendant is entitled to have the case against that defendant decided solely on the evidence and the law that applies to him.
 
 
 42
 Appellants argue that Fed.R.Evid. 105, which provides that "when" evidence is admissible against one party but not another, the court "shall" instruct the jury as to the limited admissibility, requires that instructions accompany every exhibit at the time admitted. Although there is some support for the proposition that Rule 105 mandates a contemporaneous limiting instruction when any type of evidence is admitted for a limited purpose, see 21 C. Wright & K. Graham, Federal Practice and Procedure Sec. 5065 (1977 & Supp.1987), the weight of authority is to the contrary. See United States v. Carson, 702 F.2d 351, 367 (2d Cir.) (trial court instructed jury on numerous occasions to accord each defendant separate consideration; no mention of contemporaneous instruction), cert. denied, 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1335 (1983); United States v. Losada, 674 F.2d 167, 171-72 (2d Cir.) (instructions in charge alone adequately protected against prejudice), cert. denied, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982); see also 1 J. Weinstein, Weinstein's Evidence p 105, at 105-44 (1986) ("The jury may be instructed either as the [limited] evidence is admitted or as part of the general charge.") (emphasis added; footnote omitted).
 
 
 43
 The timing of Rule 105 limiting instructions with regard to physical evidence is best left to the trial court's discretion. See United States v. Oxford, 735 F.2d 276, 280 (7th Cir.1984); United States v. Dabish, 708 F.2d 240, 243 (6th Cir.1983). Accordingly, the record must be examined to ascertain whether Vallejo and Gomez suffered any harm from the trial court's refusal to give contemporaneous limiting instructions when admitting each piece of physical evidence that was not relevant to them. See Losada, 674 F.2d at 171-72 (looking for prejudice); Weisman, 624 F.2d at 1130 (same); United States v. Toliver, 541 F.2d 958, 963 (2d Cir.1976) (same).
 
 
 44
 We conclude that Judge McLaughlin's limiting instruction in his general charge, together with his contemporaneous limiting instructions upon the admission of co-conspirator statements, adequately protected appellants. Where, as here, there are a limited number of defendants, the jury is able more easily to separate the evidence admitted against each of them. See United States v. Teitler, 802 F.2d 606, 617 (2d Cir.1986). Further, the evidence admitted without contemporaneous instructions was physical evidence that lent itself to compartmentalized consideration. See, e.g., Toliver, 541 F.2d at 963 (documents). As a consequence, the refusal of the court to give contemporaneous limiting instructions at each introduction of evidence with limited admissibility did not unfairly prejudice Vallejo and Gomez.
 
 B. DEA Expert Testimony
 
 45
 Appellants object to the admission of a DEA expert's testimony concerning the meaning of certain recorded coded telephone conversations between them. Such testimony is subject to challenge only when the expert interprets and draws conclusions from the evidence instead of simply testifying as to the jargon of the drug trade. See Nersesian, 824 F.2d at 1308; United States v. Brown, 776 F.2d 397, 400-01 (2d Cir.1985), cert. denied, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); United States v. Young, 745 F.2d 733, 760-61 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). Appellants do not allege that the agent's testimony included his interpretations or conclusions. This claim is therefore also without merit.
 
 C. Sufficiency of the Evidence
 
 46
 Chavez-Tesina, Vallejo, and Shanks-Carrera contend that there is insufficient evidence to support their convictions. It is a familiar litany that the standard for appellate review of an insufficiency claim places a "very heavy burden" on the appellant. Losada, 674 F.2d at 173. Our inquiry is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979); United States v. Barnes, 604 F.2d 121, 157 (2d Cir.1979), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). In making this determination, the evidence must be viewed in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and all permissible inferences construed in its favor, United States v. Dazzo, 672 F.2d 284, 288 (2d Cir.), cert. denied, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982). In addition, the "[e]xistence of and participation in a conspiracy with the requisite criminal intent may be established ... through circumstantial evidence." United States v. Sanzo, 673 F.2d 64, 69 (2d Cir.), cert. denied, 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982). We examine in turn the evidence against each appellant.
 
 1. Chavez-Tesina
 
 47
 Chavez-Tesina's convictions arose primarily out of his involvement in the 50 kilogram transaction. Salazar described his "partner" to de la Cova as a Colombian of Japanese descent who had lived in London. Chavez-Tesina matched the physical description and possessed a British driver's license and Colombian passport when he was arrested. When Salazar told de la Cova that his partner was travelling in New Orleans, independent evidence established that Chavez-Tesina was in fact then in New Orleans.
 
 
 48
 More important, there was testimony to the effect that Chavez-Tesina was in New Orleans looking for cocaine that would be acceptable in the New York market. As the transaction approached accomplishment, Salazar made telephone calls to Chavez-Tesina's home, confirmed by a pen register. The subject of these calls was the cocaine transaction. In one call, Salazar referred to the other party as "Diego," Chavez-Tesina's first name. The jury was entitled to believe that this evidence linked Chavez-Tesina to Salazar, the RICO enterprise, and the 50-kilogram deal.
 
 2. Vallejo
 
 49
 Vallejo, a less active participant in the affairs providing the basis for the charges, was convicted of conspiracy to possess cocaine and possession with intent to distribute arising out of the March 17, 1986 two kilogram cocaine sale to de la Cova. Vallejo argues that there was no proof that he was involved in the conspiracy. The evidence, he argues, shows at best mere association with a drug dealer.
 
 
 50
 Agent de la Cova heard Salazar tell Vallejo on March 15th that he had something "very, very good." From this the jury could reasonably conclude that Salazar referred to cocaine and that Vallejo comprehended this meaning. Just two days later, in Vallejo's presence, Gomez delivered two "favors" to Salazar. It is beyond dispute that Gomez delivered cocaine because Gomez said shortly before he was arrested that the "favors" were kilograms of cocaine. This cocaine subsequently was transported to Vallejo's house.
 
 
 51
 Further support for the inference that Vallejo was involved in a narcotics conspiracy and distributed cocaine is the fact that he delivered a small amount of cocaine to Salazar on March 21st--only moments after Salazar called and asked for some. When he was arrested, Vallejo had a beeper, $2000 in cash, a small amount of drugs and drug paraphernalia, again evidencing that his business relationship with Salazar related to the narcotics trade. See Carson, 702 F.2d at 368. This proof, as well as the reasonable inferences arising from it, supports the jury's finding that Vallejo was a knowing participant in the conspiracy.
 
 3. Shanks-Carrera
 
 52
 Shanks-Carrera was alleged to be a supporting player in the 50-kilogram transaction. It was he whom the DEA observed carrying a duffel bag--later found to be filled with cocaine--into the apartment arranged as the delivery site. Shanks-Carrera was acquitted of conspiracy, but convicted of possession.
 
 
 53
 Testifying at trial, he claimed that he had no knowledge that the duffel bag contained cocaine. Appellant explained that incriminating statements made at the time of his arrest--and hiding when DEA agents arrived--were the results of fear and a desire to protect his brother, who allegedly gave him the duffel bag. The jury was in a better position to assess these issues of credibility. Viewing the evidence in the light most favorable to the government, we find it sufficient to establish that the appellant possessed cocaine with the intent to distribute it.
 
 CONCLUSION
 
 54
 Accordingly, for the reasons discussed above, the judgments of conviction are affirmed.
 
 OAKES, Circuit Judge (dissenting):
 
 55
 I respectfully dissent.
 
 
 56
 I agree with the majority of the judges in the Fifth Circuit sitting en banc that, at the very least, the practice of permitting magistrates to conduct jury voir dire in felony cases raises serious constitutional questions. See United States v. Ford, 824 F.2d 1430 (5th Cir.1987) (en banc), cert. denied, --- U.S. ---- 108 S.Ct. 741, 98 L.Ed.2d 776 (1988). Selection of a petit jury to try a felony case has both particular and systemic importance; it implicates not only the defendant's Fifth and Sixth Amendment rights and provides the foundation upon which the remainder of the trial is built, but is essential, as Judge Patrick Higginbotham reminded us, "because the impartiality of the adjudicator goes to the very integrity of the legal system." Id. at 1435 (quoting Gray v. Mississippi, --- U.S. ----, 107 S.Ct. 2045, 2056, 95 L.Ed.2d 622 (1987)). The process of voir dire is especially significant; not only is the peremptory challenge a necessary part of trial by jury, Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), but the prosecutor's use of peremptory challenges may violate other constitutional requirements. For example, a prosecutor's challenges based on race implicate the Equal Protection clause. Batson v. Kentucky, 476 U.S. 79, 88-89, 106 S.Ct. 1712, 1718-19, 90 L.Ed.2d 69 (1986). And, while double jeopardy does not attach until the jury is sworn, Crist v. Bretz, 437 U.S. 28, 35, 98 S.Ct. 2156, 2160, 57 L.Ed.2d 24 (1978), the Sixth Amendment rights of a defendant to a speedy and public trial, accord Speedy Trial Act, 18 U.S.C. Secs. 3161-3174 (1982 & Supp. IV 1986), to be present while a jury is selected, Lewis v. United States, 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed.2d 1011 (1892); United States v. Crutcher, 405 F.2d 239, 242-43 (2d Cir.1968), cert. denied, 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969); Fed.R.Crim.P. 43(a), and to the assistance of counsel during jury selection, see Brewer v. Williams, 430 U.S. 387, 399, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977), all attach before or at the time jury selection begins. Since the whole purpose of voir dire is to obtain an impartial jury, one that is "capable and willing to decide the case solely on the evidence before it," Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982), it follows that the right to such a jury attaches from the beginning of the selection process.
 
 
 57
 Are these constitutional concerns met by the district judge's power to conduct a de novo review of the voir dire process, here specifically reserved but not utilized? Does that power satisfy the constitutional concerns above noted? The answer, I feel, is at best maybe. The district court's review of a magistrate's rulings on challenges would surely be difficult, as Judge Higginbotham pointed out in United States v. Ford, 824 F.2d at 1436-37, and would undoubtedly lead to appeals on the issue to circuit courts. Perhaps the district court has the inherent power simply to conduct a voir dire a second time. See United States v. Raddatz, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). But this approach presents serious practical problems; for example, the second interrogation of a potential juror would be likely to put that individual on the defensive, making a reenactment of the original voir dire impossible. See United States v. Ford, 824 F.2d at 1437; but see id. at 1446 (Rubin, J., dissenting). In any event, no clear-cut answer can be forthcoming unless and until the Supreme Court decides the constitutional question.
 
 
 58
 The practice of delegating jury selection to a magistrate, absent the consent of the defendant and the Government, is to my mind a bad one. Intending no offense toward magistrates, delegation demeans the process, making it appear essentially clerical in nature. At the very least it impedes the judge from personally instilling in the jury at the start of the trial a sense of the importance of the work the jury is about to perform. It is apt to make the jury less attentive to the judge during the trial, and the judge less sensitive to the problems of the individual jurors, as well as to the overall chemistry of the jury itself. For due process also demands, as well as a disinterested jury, "a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Smith v. Phillips, 455 U.S. at 217, 102 S.Ct. at 946. Events can occur during the magistrate's voir dire that would require the judge's review, but he would be disadvantaged because they occurred outside his presence. In addition, a defendant might feel shortchanged, and left with the impression that he, and his case, are of lesser consequence because the judge himself did not participate. The Constitution instructs us that every criminal defendant, regardless of his status in the community or the nature of the crimes with which he is charged, is important and entitled not only to the best practicable process but also entitled reasonably to feel as if he has received the fairest practicable process.
 
 
 59
 I cannot think that the practice--at least in a jurisdiction such as the Eastern District of New York where the judge, rather than the attorneys, conducts the voir dire--is one that can save much judicial time. It is a practice that is not followed in the Southern District of New York, and in the districts in which it is used it is exercised without established rules for determining when voir dire should be assigned and without established procedures for review. I would, in the exercise of our supervisory power, prohibit it except, possibly, when the parties consent, and then only pursuant to rules controlling the district court's review. By so doing, I would incidentally avoid the problems of statutory and constitutional interpretation that my colleagues solve with a sweep that leaves me, as I suggest, unconvinced. I therefore dissent.
 
 
 
 [1]
 Section 636(b)(1)(A) provides:
 (A) a judge may designate a magistrate to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law.
 28 U.S.C. Sec. 636(b)(1)(A) (1982).
 
 
 [2]
 Section 636(b)(1)(B) provides:
 (B) a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.
 28 U.S.C. Sec. 636(b)(1)(B) (1982). Section 636(b)(1) further provides that
 [a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.
 Id. Sec. 636(b)(1).